ANDREWS *v.* WECKERMAN.

1. BRIDGES—ESTABLISHMENT—HIGHWAYS.
    Where a township, by regular proceedings, lays out a highway across a mill pond, it acquires a right to build a bridge across the pond as a part of the highway, though there is no reference in the proceedings to the erection of a bridge.

2. HIGHWAYS—CONSTRUCTION—WATER POWER—INJURY—DAMNUM ABSQUE INJURIA.
    Where the construction of a highway across a mill pond reasonably requires the building of an embankment of earth a part of the distance, any injury resulting to the water power therefrom is damnum absque injuria.

3. SAME—REASONABLENESS.
    In constructing a highway across a mill pond by means of embankments of earth and a bridge, a waterway of sufficient width to carry the flow of the water at all ordinary stages of both high and low water is all that need be provided.

4. EVIDENCE—JUDICIAL NOTICE—WATER IN STREAMS.
    The court will take notice that the small streams of the State grow less year by year.

5. WATERS AND WATERCOURSES—OBSTRUCTION OF FLOW—ACTION
　—PARTIES.

　　Where the owners of a water power have leased it to a corpora-
　　tion in which they are the principal stockholders, the owners
　　and the corporation have no common interest that entitles
　　them to maintain suit jointly for damages for injury to the
　　power by obstruction of the flow of water.

Appeal from Osceola; McAlvay, J. Submitted Febru-
ary 1, 1906. (Docket No. 81.) Decided May 24, 1906.

Bill by James H. Andrews, Cornelia I. Andrews, and
the Reed City Electric Company against August Weck-
erman, highway commissioner, Amos Rosenberg, super-
visor, and the township of Richmond, to enjoin the ob-
struction of complainants' water rights. From a decree
for complainants, defendant township appeals. Reversed,
and bill dismissed.

Complainants own a mill site and the right to maintain
a dam over Hersey river or Hersey creek, a small stream
of water flowing through the village of Reed City and
the defendant township. Complainants introduced mesne
conveyances from James M. Reed and others in 1877 to
complainant James H. Andrews. The description of the
land in these deeds is as follows:

　　" Commencing at the northwest corner of the south-
west quarter of the southwest quarter of section ten, in
town number seventeen north, range ten west; thence
south twenty-two degrees and thirty minutes east, seven
and fifty hundredths chains; thence south twenty-six
degrees and no minutes, west five chains and twenty-three
hundredths; thence east parallel with Slosson avenue
seven and fifty hundredths chains; thence north twenty-
one degrees, east seven and fifty hundredths chains;
thence north thirty degrees and thirty minutes, west six
and twenty-three hundredths chains, to the north line of
the southwest quarter of the southwest quarter of section
ten; thence west along said line to place of beginning, the
same containing ten acres, more or less. Also, to wit:
Commencing at the northeast corner of the southeast
quarter of the southeast quarter of section nine, town
number seventeen north, of ten west, in Osceola county,

Michigan, in metes and bounds, as follows: Running west to the water's edge as it now exists in said mill dam; thence south according to the meanderings of the water's edge, thence east according to the meanderings of said water's edge to the mill dam; thence north to the place of beginning. Also the rights of flowage over the lands of the said parties of the first part and adjoining lands whereby he may raise and maintain the mill dam now on the lands hereinbefore described, and raise the water in said dam to the height of eight feet from the bottom of the shute now in the said dam, with the further right to raise the same to high-water mark as the same passes over the wasteware in said dam, so that the party of the second part may keep the water up to high-water mark at all times that to him shall be convenient and desirable."

The village comprises the S. ½ of section 9, S. W. ¼ of section 10, N. W. ¼ of section 15, and the N. ½ of section 16. The dam is located on section 10, a few rods east of the section line between sections 9 and 10. A little more than half of the surface of the mill pond is within the village limits. The other part lies north in the township. Chestnut street in said village is one of the principal thoroughfares, and extends to the northern limits of the village in the mill pond.

In 1892 a public highway was laid out by the defendant township to connect with Chestnut street, and a wooden bridge on piles constructed over the pond and river bed. In 1901 the bridge became out of repair, and the township voted to construct a new roadway by erecting an iron bridge with a span 45 feet wide, and filling in with earth on either side. Money was duly appropriated for that purpose, and the filling commenced in 1901, by drawing dirt and dumping it through the wooden bridge. The natural channel of the river in the span of the bridge is about 19½ feet wide. The fill from the south end of the bridge to the south shore of the pond is 443 feet long, and from the north end of the bridge to the north shore 53 feet. Notice was seasonably given by the complainants to the township authorities that the construction of this

road by filling in with dirt was an encroachment upon their rights and a damage to them. The township proceeded with the work, until the fills on either side left an opening or span of about 81 feet. Complainants then filed this bill to enjoin further filling and to recover damages for the fills already made.

A short distance below the highway are the bridge and track of the Grand Rapids & Indiana Railroad. That bridge is built upon piles with an opening of 124 feet between the embankments. When the dam is full the back water extends nearly a mile up the river. The highway bridge is about half a mile from the dam. The width of the pond is about 1,500 feet. The natural depth in the bed of the stream is 15 feet.

After the injunction was served, a stipulation was entered into waiving the injunction so far as to permit defendants to level off the surface of the earth embankment, fit it for travel, to erect a temporary wooden bridge over the open water between the iron bridge which had already been erected and the other enbankment, and in time replace the temporary structure with an iron bridge. The iron bridge was subsequently constructed. This stipulation reserved to the complainants all their rights to an amicable settlement or by suit either in chancery or at law. Failing to agree, complainants prosecuted the chancery suit already begun. Proofs were taken in open court, and a decree rendered for the complainants for $4,000 damages, and requiring defendants to "put in substantial stone or cement abutments at the north and south ends of the bridge, and so provide that the ends of the embankments in question will not thereafter wash away, and to within the same time remove the disused wood piles now in the water under said bridge, so that the flow of the water thereunder may be unimpeded." Upon failure to perform these affirmative acts, the preliminary injunction was to be "permanent and perpetual, without exception or qualification."

The situation may be more readily understood from the accompanying plat.

Further essential facts will be found in connection with the points decided.

*Charles A. Withey* (*M. Brown* and *J. E. Richardson*, of counsel), for complainants.

*B. N. Savidge* (*C. H. Rose* and *J. B. Judkins*, of counsel), for appellant.

GRANT, J. (*after stating the facts*). 1. This highway was laid out in May, 1892. The proceedings were regular. Andrews' grantors, then owning the mill site and the 10 acres above described, and perhaps certain rights of flowage of other lands, were made parties to those proceedings and damages awarded them. In the petition and other papers no reference was made to the erection of a bridge. Necessarily the construction of one was implied. The highway was of the usual width, 66 feet. The old mill—a grain mill—and the race had previously been burned. Nothing was left but the dam and a residence and barn. When the fire occurred the record fails to show. No steps were taken to question the validity of the highway proceedings. Andrews' grantors rested content with the determination of the highway commissioner and the award of damages. The first question naturally presented is: What kind of a highway did the township authorities acquire the right to construct?

The complainants Andrews have shown no title to the land abutting the shore or the land under the water where the highway is located. If they have any right of flowage, it is by prescription, and as to that the evidence is meager. Undoubtedly the grantors of Mr. Andrews were made parties on account of their supposed right of flowage. The township thereby became a riparian owner and possessed the right to occupy this space, 66 feet wide, across the mill pond in the construction of a highway for the public. It was not limited to any particular form of structure. It was under legal obligation to leave an opening sufficient for the flow of the water at all ordinary

stages of both high and low water. Having done this, it might erect a solid embankment from the shores to the bridge over such opening. It has left one over the natural channel and current of the river and extending 60 feet outside of such channel, with an average depth of 10 feet. If such a construction is reasonable, and we think it is, and one which the interests of the public demanded, of which there is no doubt, it being one of the principal thoroughfares of the village and township, the action of the township is lawful, and any injury to the complainants is damnum absque injuria. This court said, in *Dumont* v. *Kellogg*, 29 Mich. 420:

"It is therefore not a diminution in the quantity of the water alone, or an alteration in its flow, or either or both of these circumstances combined with injury, that will give a right of action, if in view of all the circumstances, and having regard to equality of right in others, that which has been done and which causes the injury is not unreasonable. In other words, the injury that is incidental to a reasonable enjoyment of the common right can demand no redress."

The reasonableness of the use and enjoyment in each particular case is the controlling factor. *Rowe* v. *Granite Bridge Corporation*, 21 Pick. (Mass.) 344; *Sprague* v. *City of Worcester*, 13 Gray (Mass.), 193. In the latter case Chief Justice Shaw held that "all the defendants [the municipal authorities] were bound to do was to build a bridge with a waterway reasonably sufficient to carry off the water in its ordinary and usual condition, at all seasons of the year." See, also, *Callender* v. *Marsh*, 1 Pick. (Mass.) 418; *Ely* v. *City of Rochester*, 26 Barb. (N. Y.) 133; *Hoxsie* v. *Hoxsie*, 38 Mich. 77. But for the complainants' mill pond a bridge covering an opening of 45 feet would have been amply sufficient. Other bridges in the vicinity over this same stream, above and below, are built with that width of opening.

2. Without entering into details of the evidence, we are satisfied that complainants failed to make out a case for damages. It seems apparent that a space 81 feet

wide, extending over the natural channel, and on an average 10 feet deep, will take the water from above the bridge as rapidly as it will be drawn off through the raceway for use of the complainant company. Actual measurements and experiments, which are better evidence than the testimony of alleged experts, demonstrate that the pond above the bridge lowers as fast as that below when the water is drawn off at the raceway. Furthermore, it appears from the complainants' own evidence that there had been no lack of water for the use of the electric company until the summer of 1904, two years after these embankments and bridge were constructed. It is conclusively established that that was due solely to the unprecedented drought of that season. The electric company had put in an engine in case of emergency, but it had no occasion to use it until that summer. Clearly the electric company had suffered no damage from the act of the township, but only from the act of God. In view of these facts, we may well believe the testimony of the witness who testified that in January, 1903, Mr. Andrews said "that he had suffered no damage as yet, and did not know that he ever would." The record fails to show how far the south embankment extends beyond that of the railroad. It evidently is but a short distance. An examination of the plat shows that whatever current there may have been in this pond against the railroad embankment is not impeded to complainants' injury by the highway embankment directly west of it and only about 100 feet distant. It is also shown that this stream, like other small streams, grows less year by year. Of this courts will take judicial notice. *Hilliker* v. *Coleman*, 73 Mich. 170.

3. The two complainants, the Andrews and the company, have no interests and have suffered no damage in common which entitle them to maintain suit jointly therefor. The complainants Andrews have no interest in the damage suffered by the electric company. The electric company has no interest in the damage to the freehold of

complainants Andrews. The fact that the complainants Andrews are stockholders of the electric company is immaterial. The company is a distinct entity. The term of the lease is not given. For all that appears it may be 99 years, or a perpetual lease. Complainants Andrews, owning the fee, would not be responsible to the electric company for any injury done to its leasehold by the township authorities. The action of the township authorities, if damage did result, would form no defense to an action upon the lease. If the electric company brought suit against the township for damages, the injury to the freehold would not affect the measure of damages to be given the leasehold interest. The measure of damages in the one case would be different from that in the other. Complainants may have had a common interest in procuring an injunction to restrain the obstruction of the flow of the water; the electric company, because it was interested in maintaining the flow of the water for immediate use; the owners of the fee, because they were interested in maintaining its flow for future use after the termination of the lease. The stipulation removed from the consideration of the court this common interest, and left only for future adjustment by suit or otherwise the question of damages. For this a suit at law would have been the only remedy, in which the complainants could not have been joined. The fee owners can suffer no damage from a diminution of the water until the expiration of the lease. The life of the lease and its terms are important in determining the injury to the freehold. If complainants desired to continue this suit in force for the determination of damages to each, it was incumbent upon them to show what damage each had suffered, and to have a decree for each specific amount. There is no data from which to apportion damages, even if any were suffered.

Decree reversed, and bill dismissed, with costs of both courts.

MONTGOMERY, OSTRANDER, HOOKER, and MOORE, JJ., concurred.