KERLEY *v.* WOLFE.

1. EVIDENCE—JUDICIAL NOTICE—COUNTY ATLAS.
    The Supreme Court takes judicial notice that a county atlas that was published 85 years ago has evidentiary value in ascertainment of facts then existent pertaining to boundaries and physical geography although the portrayals are not conclusive.

---

REFERENCES FOR POINTS IN HEADNOTES
[1] 20 Am Jur, Evidence § 982.
[2] 56 Am Jur, Waters §§ 58–62.
[3] 56 Am Jur, Waters § 60.
[4] 56 Am Jur, Waters § 273 *et seq.*
[5] 56 Am Jur, Waters § 269.

2. WATERS AND WATERCOURSES—FENCE ACROSS NECK OF LAKE—
RIPARIAN RIGHTS.

Finding of trial court that fence erected by defendants across
narrow neck of summer-squash-shaped lake prevented plain-
tiffs from exercising their riparian rights of boating and
fishing over the entire lake *held*, supported by competent
evidence showing that the lake in its natural state extended
to and bordered plaintiffs' premises and still so extends and
is navigable, notwithstanding nature's process may have filled
in the area to some extent.

3. SAME—TITLE TO SUBAQUEOUS LAND OF INLAND LAKE—TRUST.

A riparian owner's title to subaqueous land of an inland lake
is impressed with a public trust so long as boatable waters
stand or flow in the lake and people having access to such
waters may boat and fish in the same provided they do not
trespass on fast and privately held lands.

4. SAME—RIPARIAN RIGHTS OF NAVIGABLE WATER.

The essence of the doctrine of riparian rights is that no upper
or lower riparian proprietor may dispute passage by water
of his riparian neighbor when the stream or lake commonly en-
joyed by all has been made navigable in fact by nature.

5. EQUITY—JURISDICTION—TRUST—SUBAQUEOUS LAND—TITLE.

Equity court had jurisdiction to preserve trust imposed upon
defendants' subaqueous land in lake so as to protect plaintiff
riparian owners' rights of boating and fishing, the remedy
of ejectment not being available, since the title to the land
involved is not in dispute and no party is in actual possession.

Appeal from Oakland; Neuenfelt (Lila M.), J.,
presiding. Submitted June 11, 1957. (Docket No.
46, Calendar No. 47,139.) Decided September 4,
1957. Rehearing denied November 26, 1957.

Bill by Robert V. Kerley and Elaine J. Kerley
against Irwin R. Wolfe and Clara L. Wolfe to en-
join interference with their riparian rights on inland
lake. Decree for plaintiffs. Defendants appeal.
Affirmed.

*Clarence L. Smith,* for plaintiffs.

*Beer, Rowston & Currah (William John Beer,* of counsel), for defendants.

BLACK, J. Inland Lake Narrin occupies the greater portion of the northeast quarter of section 23, plus smaller portions of adjacent sections 13 and 24, of Oakland county's Groveland township. It is shaped like a summer squash, with the bulbous and deeper part situated in sections 23 and 24 and the shallower neck extending northeasterly into section 13 as far as 2 highways. One of the highways extends north-south and touches the lake at northeasternmost or stem end. The other extends in a general northeast-southwest direction and borders a short distance along the northernmost part of the neck.

Plaintiffs and defendants own contiguous acreage in section 13. The respective premises so owned by the contending parties is covered in part by the extremely shallow waters of the described neck of the lake. At one point defendants' premises extend, upland to fast land, entirely across the neck and at this point they have erected a fence designed to prevent passage of rowboats and other small craft from the upper end of the lake (where plaintiffs' premises are situated) into the main body thereof. Plaintiffs, claiming that they are riparian proprietors with right of boating and fishing between their part of the shore and the larger portion of the lake, filed this bill to abate the fence and enjoin its maintenance.

We have described the physical situation as it appears from exhibit 25 in the case,* and present

---

* Exhibit 25 is a complete page from the Oakland county atlas of 1872. It portrays, in the usual form of Michigan atlases prepared in the eighteen-seventies, Groveland township's land ownership and geographic characteristics including location of highways, railroads, lakes and watercourses, and then existent post offices and villages.

proprietorship as it appears from the proofs. The principal question—aside from jurisdiction of equity—is whether the lake ever did extend to plaintiffs' premises in such manner as to provide their predecessors, and plaintiffs in turn, with riparian rights as claimed. In such regard defendants insist that the vicinity of dispute was never anything more than swamp or marsh and that it is nonnavigable both in fact and law. A secondary question is whether, assuming plaintiffs' said premises did at one time border on Lake Narrin with then accruing riparian rights, nature has not long since changed the character of the bed of the lake so that such rights are now extinct.

The issues so made were tried in detail. Dr. Donald MacLachlan, a professor of geology and principal witness for defendants, testifying from personal examination of the area in question, said:

"I would call the area between the 2 fences marsh. A marsh is a low-lying, wet, soggy tract of land. It's described as land usually, wholly, or partially covered with shallow water. There are certain characteristics which are part of a complete definition of marsh; one of the characteristics is that the water covering the marsh be relatively shallow. The entire marsh may exist in a discontinuous body of water. If it exists in a continuous body, the level of the water in this body may be the same or may be at a different level. Another characteristic is the character of the plant life. I think the plant life characteristic of a marsh can best be described by giving the general nature of the forming of the marsh. Most marshes are formed from water in a

It was received in evidence, as a qualified ancient document, and its accuracy for present purposes is not seriously challenged. We take judicial notice that the county atlas of that period has evidentiary value in ascertainment of facts then existent pertaining to boundaries and physical geography. The portrayals are not conclusive, of course, yet they tend to supply in many cases that which no living witness can affirm.

body or depression in which there is water, and formed by filling up this depression from a condition of open water to what is typically a marsh condition. If the original body of water is fairly deep, then usually the beginning of the filling process is accomplished. Detrital material; sand, mud, and silt is washed in from the land. After the body becomes sufficiently shallow, then the plants begin to grow on the bottom, and when the plants begin to grow and begin to add in the fill, at first when the water is still relatively deep and the area still may be considered something other than a marsh, the plants are primarily floating forms of life and gradually, when dying, settle to the bottom of the lake, or pond, or what is going to be a marsh, and tend to build up the bottom of the area. Shortly following that, water lilies begin growing, and as they die, more and more vegetation accumulates and keeps getting more and more shallow. Ultimately sometimes, you have a floating bog, I mean a floating mass of vegetation, and as the lake becomes nearer filled the later part of the filling being done by vegetation, sedges begin to take hold and they are followed in turn by shrubs, and these in turn are followed by spruce and tamarack. Water in a marsh may occur in disconnected bodies of water or you can call it accluded water."

He testified further, with reference to the secondary question noted above:

"It is entirely possible that the lake proper, at one time, covered the area depicted in plaintiffs' exhibit 25, an 1872 atlas. I could logically draw that conclusion from the tree line and the hard land line and the floor covered with muck and decayed vegetation. If you had some old residents who came in here and so testified, I would be in no position to doubt their word. I see no evidence of the wash of sand from the process of waves having affected the area towards Kerley's. There is a very strong indication of the process of filling to the decay of vegetation. That's why, when you even wade up by Kerley's,

there is clear water down a little ways, and then there is soft substance that's largely decayed vegetation. There may come a time when you couldn't row a boat over that area if that process continued over a period of time. That same process occurs generally in the shallow portions of our inland lakes. To a lesser extent it occurs in the bottom of the deep portions of these lakes. There is an enclosement of vegetation toward the bottom of the lake. In the center of Narrin lake you would expect to find an accumulation of sediment on the bottom of that lake by reason of the variation of depth, [but] its importance becomes minimized."*

The chancellor, in a painstakingly prepared opinion, analyzed the testimony of each witness. She came to conclusion that "this area is part of Narrin lake and that as a result thereof, plaintiff (plaintiffs) is entitled to riparian rights." Decree accordingly passed for plaintiffs. Defendants appeal.

*First:* At conclusion of the proofs the chancellor obtained a small boat and, in company of the court stenographer, rowed over the entire vicinity of dispute. Her log of the voyage fairly records all essential details. It is quite consistent with testimony and finding that the waters extending from plaintiffs' premises to the deeper part of the lake were and are navigable in fact by small boats and canoes; that the upper as well as lower end of the lake as delineated on exhibit 25 was and is in regular use for boating and fishing purposes; that there is 18 inches of boatable water in the shallowest part of the disputed area in the driest time of year;† that

---

* The witness here does no more than attest that which this Court has judicially noticed (*Hilliker* v. *Coleman*, 73 Mich 170; *Andrews* v. *Weckerman*, 144 Mich 199).

† The chancellor's boat trip took place July 28, 1955. After having noted that "This has been the hottest season that the area has had," the chancellor said that "of all times of the year to view the premises, this would have been the most unfortunate one so far as the plaintiffs are concerned inasmuch as if the area was going to be dry, it would have been at this time of the year."

fishermen occasionally put in their boats or canoes at one of the mentioned highway intersections and pass back and forth between both ends of the lake; that the neck of the lake provides good fishing and a part thereof is known as "the bass grounds;" that the fence so erected by defendants does interfere with rights plaintiffs possess as riparian proprietors, and that Lake Narrin in its natural state extended to and bordered plaintiffs' said premises and still so extends.

We have been shown no reason for disagreement with the noted finding of facts and are impressed, as was the chancellor, that exhibit 25 correctly and accurately portrays Lake Narrin in its natural state. Too, we agree that whatever filling has taken place, by nature's process since exhibit 25 was prepared, has not destroyed the navigable features of the upper end of the lake in the vicinity of lands owned by the presently contending riparian proprietors. Such part of the lake being navigable in fact is navigable in law (*Collins* v. *Gerhardt*, 237 Mich 38, 43).

*Collins,* a leading case, settles the disputed question of navigability and status adversely to these defendants. It sustains application of the theory that defendants' title to the subaqueous land in question is impressed with the public trust Justices McDONALD and FELLOWS considered at length in respective concurring opinions (see pages 45, 46, 47, 48, 55 and 56 of *Collins'* report). So long as boatable waters stand or flow in the upper reaches of this inland lake, people having lawful access to such waters may boat upon and fish in the same, provided they trespass not on fast and privately held lands (*Collins,* p 49 of report). Such is the theory of plaintiffs' bill in this case, it having been made clear that they desire nothing in the way of an exclusive right and that they "have no objection to the public being there."

The right sustained below and confirmed here has properly been likened to that of owners of land abutting highways and streets (*Hall* v. *Wantz*, 336 Mich 112, 117). It is the doctrine of riparian rights, the essence of which is that no upper or lower proprietor may dispute passage by water of his riparial neighbor when the stream or lake commonly enjoyed by all has been made navigable in fact by nature.

*Second:* Defendants contended below and insist here that equity's jurisdiction was not properly invoked by this bill and that plaintiffs' remedy is at law, by ejectment. They rely entirely on *Beach* v. *Rice*, 186 Mich 95. Plaintiffs counter with *Manney* v. *Prouse*, 248 Mich 655. Neither counsel refers to or considers *Pleasant Lake Hills Corporation* v. *Eppinger*, 235 Mich 174, wherein *Beach* was placed in its proper setting so far as actions of present nature are concerned.

Plaintiffs do not seek to eject defendants from their lands and would be unable to do so at law, the ascertained facts of this case considered. No party to this case is in actual possession of that which is in dispute. Plaintiffs do not attack defendants' title. They do insist that defendants' premises, as well as their own, are impressed with the previously considered trust. They seek by their bill only to preserve such trust as against its threatened destruction. *Pleasant Lake Hills Corporation* v. *Eppinger, supra,* sustains the jurisdiction in present instance and we believe it should be followed.

The chancellor's decree accomplishes a result agreeable to equity. It is accordingly affirmed, with costs to plaintiffs.

DETHMERS, C. J., and SHARPE, SMITH, EDWARDS, VOELKER, KELLY, and CARR, JJ., concurred.