381 Mich. 180 (1968)
160 N.W.2d 909
In re MARTINY LAKES PROJECT.
MECOSTA COUNTY BOARD OF SUPERVISORS
v.
CONSERVATION DEPARTMENT.
MOORMAN
v.
SAME.
Calendar No. 6, Docket No. 49,859.
Supreme Court of Michigan.
Decided September 25, 1968.
Rehearing denied February 3, 1969.
Robert L. Miles, for plaintiffs.
Frank J. Kelley, Attorney General, Robert A. Derengoski, Solicitor General, and Nicholas V. Olds and Esther E. Newton, Assistant Attorneys General, for defendant.
Amicus Curiae on application for rehearing: Michigan United Conservation Clubs, by A. Newton Dilley.
*185 BLACK, J.
Case No. 49,859 presents a controlling question of right of the board of supervisors of Mecosta county to proceed under PA 1961, No 146 (CLS 1961, § 281.61 et seq. [Stat Ann 1961 Cum Supp § 11.300 et seq.]), known as the inland lake level act of 1961,[1]"to have determined and established the normal height and level of the water of the Martiny lake project and the back waters of the Winchester dam (herein all called the Martiny lake project) in the county of Mecosta, Michigan."
The Winchester dam was constructed in 1954-1955 by the department of conservation. The cost of land acquisition and construction was supplied exclusively from State and Federal funds. Martiny lake, otherwise referred to as the Martiny lake project, is the result. It is an artificial inland public lake within the act of 1961.
Prior to construction of the dam the upstream watershed included a series of small interconnected natural lakes making up the headwater source of the west branch of the Chippewa river. Then the streams which connected the lakes, and the west branch outlet across which the dam was constructed, if "navigable" at all were "navigable only in a qualified sense." The reference is to Shepard v. Gates (1883), 50 Mich 495, and Valentine, ex rel. Dudley, v. Berrien Springs Water-Power Co. (1901), 128 Mich 280, 286-290. We shall come to these cases later.
Case No. 50,233 is ancillary to No. 49,859. It consists of a bill filed by certain riparians of Martiny lake, the aim of which is injunctive relief against the conservation department's announced plan of lowering the normal level of Martiny lake some 18 inches. That action was held in abeyance pending hearing and determination of the statutory proceeding.
*186 The statutory proceeding resulted in a judgment reading as follows:
"It is ordered and adjudged that the water level to be established and maintained for the waters of the Martiny lakes chain and the back waters of the Winchester dam, Mecosta county, Michigan, be and is hereby determined and established at 993.8 feet above mean sea level datum as measured at the aforesaid Winchester dam, and shall be maintained as nearly as it is possible to do so at said level, hereby established as the normal level at all times between May 15 and September 15 of this and every year hereafter; provided however, that the conservation department of the State of Michigan shall have the authority, when it so chooses, to vary said level by lowering the same not to exceed 18 inches after September 15 of this or any ensuing year, provided the normal level as aforesaid is restored prior to May 15 of the next ensuing year."
The chancery proceeding was disposed of by a decree of dismissal based upon these legal and factual conclusions of the chancellor:
"After careful consideration of all the evidence, arguments, and briefs, it is the opinion of this court that there has been no evidence presented or any reason advanced, based upon the doctrines of prescription, dedication, or estoppel, or any other equitable principle, which would remove this case from the operation of the rule as set out in Drainage Board v. Village of Homer [1957], 351 Mich 73, which states that the owner of the fee and/or flowage rights surrounding water impounded by a dam may alter the level of such water between the limits of the flowage rights and the natural level of the river or stream. This court is of the opinion that the ruling in the Homer Case covers this case especially when considering the fact that this court has recently determined the level of these waters under the inland lake level act of 1961. (See Heitsch v. Oakland *187 County Drain Commissioner [1956], 346 Mich 381.) In reliance upon said cases, it is the further opinion of this court that the plaintiffs have no equitable right to enjoin the defendants from raising or lowering or otherwise altering the waters of Martiny lakes as described in this case."
The attorney general has appealed from the judgment entered in the statutory action. The plaintiffs have appealed from the decree of dismissal entered against them in the chancery case. The two appeals were consolidated and submitted here April 6, 1965. July 14, 1965, the parties having promptly responded to certain questions propounded by the Court, an order of remand for further proof and a supplemental opinion of the statutory action was entered. That order has been duly executed. Both appeals were resubmitted January 10, 1968.
1. The Statutory Proceeding (No. 49,859).
The decisive question here is whether the legislature intended, by presently quoted section 13 of the act of 1961, that the well-known and regularly employed power of inland lake level determination, provided by the successive statutes which section 26 of the act of 1961 expressly repealed, which power is now provided by the act of 1961, should no longer apply to an artificial inland public lake such as has resulted from the construction and maintenance of Winchester dam. The point involves more than the rights of littoral proprietors, for the great desideratum of the act of 1961 (also its predecessor, the act of 1939, No 194 as amended by PA 1954, No 121) was and is that of determination and maintenance of inland lake levels for the public welfare and benefit.
This may be seen upon precise comparison of the factual views of the present contenders. That the 18-inch drawdown of Martiny lake, as proposed by *188 the department of conservation, would if accomplished impair the public enjoyment and use of Martiny lake is tacitly conceded. The area of the lake would be reduced sizably, wide subaqueous portions thereof would be exposed and public as well as private access to the lake would be rendered more difficult. On the other hand, it is established that the drawdown would further substantially the department's wildfowl nesting and feeding program and its fish propagation plans.
Thus it readily appears that the board of supervisors and circuit court, with the department of conservation holding contra, view the general recreational worth to the public of Martiny's present impound as being entitled to superior consideration within the aim of the act of 1961 as declared in the title and third section thereof, also within the purpose of the permit for construction of Winchester dam (quoted post) which the board of supervisors issued to the conservation department in 1934.
The issue of legislative intent arose at the outset when the attorney general moved to dismiss this proceeding. His motion was grounded upon these allegations:
"PA 1961, No 146, is not applicable to dams in navigable streams and the waters impounded thereby.
"The county board of supervisors has no power to cause a level of waters impounded by a dam to be determined and maintained when such dam and rights to maintain the resulting impoundments are owned by the State of Michigan, as is the case in the Martiny lake project and the backwaters of the Winchester dam."
Assigned in support of these positions is section 13 of the act of 1961, the critical phrasing of which *189 is emphasized by marginal quotation.[2] The corresponding section of the equivalent act of 1939 (PA 1939, No 194) read this way:
"Sec. 6. Nothing herein contained shall be construed to alter, limit, abridge or amend the provisions of law applicable to the location, construction and maintenance of dams in navigable streams, as provided in sections 1143 and 1144 of the compiled laws of 1929, as amended."
Section 16 of still another enactment of substantially the same statute, that is, PA 1945, No 276 (also repealed by the act of 1961), was identical. With respect to all three of these successive statutes (acts of 1939, 1945 and 1961) we conclude that the legislature must have employed the term "navigable streams" in the sense intended by sections 21 and 22 of PA 1851, No 156,[3] and also by the respective Constitutions of 1850 (art 18, § 4), 1908 (art 8, § 14) and 1963 (art 7, § 12), according to the interpretation placed thereon by Justices COOLEY, CAMPBELL and GRAVES in Shepard v. Gates, supra.[4] That view leaves the original artificial inland lake level jurisdiction of the circuit court intact and avoids an inevitably consequential statewide question: whether any function of the judiciary, as regards the determination *190 or maintenance of artificial inland lake levels, remains, save only in that rare instance where the impound in question is the result of damming of some brook or meandering small creek. Indeed, should this Court pursue to the ultimate the argument of the attorney general, no such function would remain at all. See discussion, post, of certain Federal decisions the attorney general cites in support of his position.
Thoughtful examination of the common-law decisions gathered in Collins v. Gerhardt (1926), 237 Mich 38, and Attorney General, ex rel. Director of Conservation, v. Taggart (1943), 306 Mich 432, suggests that it borders the senseless to attribute to the legislature an intent  by sections 5 and 10 of the act of 1961  to re-enact the long-since matured and regularly exercised power of boards of supervisors (to petition the circuit court from time to time for determination of artificial inland lake levels) and then  by section 13 of the act  to strip that power down to the rare instance mentioned above.[5] To this we need but add that the straining of such an intent, from the act of 1961, would automatically eliminate the corresponding power of the conservation department which sections 8 and 10 of the act of 1961 have provided. We are not ready to go that far or to say that the legislative purpose on May 31, 1961, was practically to gut this comprehensive inland lake level statute by including said section 13 therein.
The "qualified sense" to which we have referred was determined and applied, in Shepard v. Gates, supra, to the headwaters of the east branch of the Au Gres river in Iosco county. There the Court ruled, as against objection that the board of supervisors *191 had not authorized construction of the bridge defendant allegedly destroyed (p 497):
"The objection that no authority had been given by the board of supervisors to build the bridge would have required attention if it did not appear that this branch of the Au Gres was only used for floating logs, and does not appear to have been adapted in its natural condition to any valuable boat or vessel navigation. The clause in the Constitution providing that `no navigable stream in this State shall be either bridged or dammed without authority from the board of supervisors of the proper county, under the provisions of law' has been understood as adopted in furtherance of the policy of the Ordinance of 1787, which stipulated that `the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and forever free,' et cetera. Ordinance of 1787, art 4. That has been considered as referring to navigation in its proper sense by some sort of boats used as means of carriage."
The foregoing rule of Shepard v. Gates, supra, was applied in upholding the validity of a franchise issued pursuant to sections 21 and 22 of the mentioned act of 1851 for the damming of the St. Joseph river at Berrien Springs in Berrien county. Valentine, ex rel. Dudley, v. Berrien Springs Water-Power Co. (1901), 128 Mich 280, 286-289. And in Burroughs v. Whitwam (1886), 59 Mich 279, the Court refused for Shepard's reason to apply the Ordinance of 1787 to the "Thread River" in Genesee county (p 283):
"The Ordinance of 1787, in providing that the `navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between them, shall be common highways, and forever free,' et cetera, did not by its terms, or in the spirit of its *192 enactment, dignify every little rill or brook whose waters finally reached these great rivers into a navigable stream. It was intended to and did apply only to such streams as were then common highways for canoes or bateaux in the commerce between the northwestern wilderness and the settled portions of the United States and foreign countries, and as to such rivers not then in use as would by law be embraced in the definition of `navigable waters.'"[6]
That there is a recognized distinction between the status of small streams which by the common law belong to the public for the limited purposes of flotation and fishing, and that of larger streams which are navigable "in the more enlarged meaning of the term," admits now of no doubt. In the trespass action of Collins v. Gerhardt, supra, presenting for decision the claimed public right of wading and fishing over private property in Lake county's Pine river (the result of which was two separate opinions signed by the same five Justices with three Justices dissenting), the close question of common-law "navigability" was held to be a question of fact resolvable by verdict of a jury, just as in that bellwether of floatability, Moore v. Sanborne (1852), 2 Mich 519. To quote Justice FELLOWS, for five members of the Court in the Collins Case (p 50):
"My views on the subject here involved are, however, pronounced, and I desire to deal with certain phases of it at some length. I shall not take time or space in discussing the question of whether Pine river is a navigable stream. That question was submitted to the jury in a charge not complained of, which correctly gave the rule in force in this State. *193 The jury found it was a navigable stream and there was an abundance of testimony taking that question to the jury."
The distinction was highlighted in Attorney General, ex rel. Director of Conservation, v. Taggart (1943), 306 Mich 432, 441, 442:
"Many decisions following the Sanborne Case clearly distinguished between streams navigable for boats and those floatable for logs and, with respect to the latter, gave the public an easement of passage for the purpose of floatage and only such other rights as are incidental thereto. Middleton v. Flat River Booming Co., 27 Mich 533; Attorney General, ex rel. Muskegon Booming Co., v. Evart Booming Co., 34 Mich 462; Koopman v. Blodgett, 70 Mich 610 (14 Am St Rep 527); City of Grand Rapids v. Powers, 89 Mich 94 (14 LRA 498, 28 Am St Rep 276); Giddings v. Rogalewski, 192 Mich 319; Winans v. Willetts, 197 Mich 512. While the Sanborne Case only disposed of the right of floatage and did not decide that a floatable stream has the status of waters navigable for all purposes, the public character of water was held to be determined by reference to the public necessity for its use. It is this broad underlying principle rather than the narrow rule of the Sanborne Case which was in effect adopted by the court in Collins v. Gerhardt, supra, when it held that floatability determined the public character of a stream and affixed therein the public right of fishing."
The attorney general however would cast this distinction aside. Roaming past section 13's intent and purpose and into the great yonder of the Federal system, he cites United States v. Rio Grande Dam & Irrigation Co. (1898), 174 US 690 (19 S Ct 770, 43 L Ed 1136);[7] and Federal Power Commission v. *194 Union Electric Co. (1964), 381 US 90 (85 S Ct 1253, 14 L Ed 2d 239), as authority for urging that this Court should extend the State's "jurisdiction" to all of our nonnavigable streams, according to the analogy made between the Rio Grande and the Hudson in the first of the two cited cases (174 US 690, 709). That the reader may comprehend fully the extent of this argument, this complete paragraph of the attorney general's brief is quoted:
"By transferring the analogy from the Hudson river to the Saginaw river in our State, it can be easily understood that if the State of Michigan intends to protect for all time the navigable capacity as well as the many uses which the public may make of the Saginaw river, by necessity, it should exercise control over the entire Saginaw valley system including its upper and remote regions among which is the south branch of the Chippewa river. The result is that all of the tributaries that contribute to the total capacity and the flow of the Saginaw river, in a sense, should be considered in fact and in law the navigable waters of the State. It is only in this manner that the State could effectively exercise its trusteeship and its surveillance over these waters."
The argument is interesting but inapposite. We are not concerned today with any question of undue appropriation of water by some upstream riparian as in the Rio Grande Case, nor with the application of a Federal statute to an asserted Federal right as in the Federal Power Case.[8] Our sole task is that *195 of ascertainment of the hitherto considered question of legislative purpose.
Here we ascertain that purpose by applying a mature rule of statutory construction, the one which in so many words says that a word or phrase, when employed again and again in amendments, codifications, or re-enactments of related and longstanding statutes without cue or clue that such word or phrase be viewed differently than when such word or phrase was applied in earlier decisions of unanimously settled import, will be taken again by the Court as theretofore construed and applied. See 50 Am Jur, Statutes, § 442, Legislative Adoption of Judicial Interpretation, pp 461, 462. As the legislature proceeds from time to time with the process of amending, codifying, or re-enacting maturely purposed statutes, that body is entitled to depend trustfully upon the word of this Court whenever that word appears as precisely and unanimously as it did in the Shepard Case.
Whether in its natural state this uppermost reach of the west branch of the Chippewa did or did not, prior to the present damming, come within Moore v. Sanborne's common-law rule, one feature stands out from this record. It is that the Martiny impoundment was intended to be a public lake to the fullest extent of the term within section 1(b) of the act of 1939 (No 194), now within section 2(c) of the act of 1961. The impound was authorized, understood, and publicly proclaimed in the first place not for game and fish propagation purposes but for general public use. The statutorily authorized permit itself, issued by the board of supervisors for construction of this Winchester dam, is demonstrative. We are loath to impute to the legislature an intent *196 of authorizing, without judicial proceedings conforming with the act of 1961, impairment in any degree of what was contemplated thereby. The permit reads:
"Whereas, there is a project being promulgated for the building of a dam across the Chippewa river where it crosses section 5, Sheridan township, Mecosta county at the place formerly known as Winchester, which said dam would raise the water of Chippewa river and the water level of 16 lakes large and small, from 6 to 9 feet, and
"Whereas, between 2,500 and 3,000 acres of water would thus be created, greatly enlarging the resort facilities of Mecosta and increasing the valuation of Sheridan, Martiny, and Chippewa township by creating additional resort facilities, and would greatly add to the hunting, fishing and trapping territory in the above township and create a large expanse of public water, and
"Whereas, the department of conservation of the State of Michigan desires the consent of the board of supervisors to build said dam across said Chippewa river at the point indicated, and this board believes that such project is not only a worthy project but is one that will bring much benefit to the public at large and to the county of Mecosta.
"Therefore, be it resolved, that the department of conservation be and hereby is authorized by the board of supervisors of Mecosta county to construct such a dam across said Chippewa river at the place formerly known as Winchester, in section 5, Sheridan township, Mecosta county, Michigan, as in its discretion it shall deem necessary and adequate to accomplish the project of raising the level of said river and lakes to the level desired by said department."
To conclude disposition of No. 49,859:
Since section 13's claimed application in bar of this proceeding depends upon a factual question, we *197 might well rest our determination of affirmance upon Judge Van Domelen's amply supported finding that Winchester dam did not impound the waters of a "floatable stream" (the term employed in the Taggart Case, supra), citing only the judge's finding and Justice FELLOWS' question-of-fact opinion of Collins v. Gerhardt. For Judge Van Domelen's factual ascertainments and ultimate conclusion we suggest reading the appendix hereto. His ascertainments and conclusions are, however, employed here only as firmly establishing that this portion of the west branch never could have been considered as "adapted in its natural condition to any valuable boat or vessel navigation." (Quotation from Shepard, supra, at 497).
Hence, (a) having traced the purposeful use to date of the term "navigable stream" [or "streams"] in the successive statutes and constitutional provisions considered above, and (b) having determined that on each occasion of statutory or constitutional employment thereof the designation was advisedly used in the "more enlarged meaning of the term," it is ruled that section 13's restriction applies only to "the determination, establishment or maintenance" of the level of waters impounded by dams of streams which, according to submitted and received proof of their natural condition, were navigable by Shepard's standard.
Moreover, by resting decision upon the applicability of Shepard's rule to section 13, it is believed that this opinion will be of material assistance to the legislature when and if that body undertakes consideration of the conservation department's heralded intention of seeking an amendment of section 13  "to avoid confusion."[9]
*198 The judgment of the circuit court in No. 49,859 is affirmed. No costs.
2. The Moorman Chancery Case (No. 50,233).
The controlling fact of No. 50,233 is that the conservation department duly and precedently acquired for the State, by purchase, gift, or condemnation, title in fee to the site of the Winchester dam and to approximately two-thirds of all of the riparian land affected by the planned impound, plus all outstanding flowage rights as were legally required to establish and maintain the impound up to a maximal waterhead of 995.5 feet (above sea level). Such of the riparians as retained title in fee executed easements of flowage in due form, granting to the State "the full and free right and authority forever to flow, flood, and impound water to a height not to exceed 995 feet and 6 inches above sea level at the dam," and granting to the State "the further right and authority to permit the public to use the aforesaid waters of the flooded area to the land described herein for any public purpose including fishing, boating, navigation, hunting and trapping." There is no ambiguity in these words. Nothing was left to qualificationary understanding or misunderstanding. Specific rights in property passed by the instruments, leaving no equity for cognizant consideration by equity.
When these riparian owners executed and delivered the quoted grants of easement, they did not lose thereby all of their riparian rights. They did part with the right to object in equity either to the flooding of their property, up to the stipulated waterhead level, or to the lowering of such level. The applicable rule of property was settled in this State by *199 Drainage Board v. Village of Homer, 351 Mich 73, following Goodrich v. McMillan, 217 Mich 630 (26 ALR 801). We perceive no legal or equitable reason for departure in No. 50,233 from that rule and hold that the Moorman bill was properly dismissed.
The decree of the circuit court in No. 50,233 is affirmed. No costs.
DETHMERS, C.J., and KELLY, O'HARA, and T.E. BRENNAN, JJ., concurred with BLACK, J.
APPENDIX
(Circuit court opinion on remand, No. 49,859, exclusive of preliminary paragraphs, filed November 10, 1966.)
"This court has read all of the exhibits offered by either party. The testimony and the exhibits have fairly exhausted the information available upon this question considering that the answer involves events which few living persons can now recall. From the testimony and exhibits, it is the finding of this court that in its natural state the west branch of the Chippewa river between Tubbs lake and the present site of Winchester dam was not a navigable stream within the ordinary connotation of that term. Small rowboats drawing several inches of water were able to proceed in that area if the occupants were willing to drag them over shallows, bars, and other obstructions or by skillful use of a pole and shifting of weight a small boat may have been propelled over the distance at high water. However, this area of river was not navigable in the sense that it would ordinarily be used for travel even during high water. The use of boats in this stretch was limited to hunters, trappers, and spear fishermen who were prepared to wade and pull their boats over the shallows. This conclusion is confirmed by the testimony of the witnesses who traveled this portion of the stream as fishermen and trappers.
*200 "This leaves the question of whether this portion of the stream was navigable in the sense that it was capable of floating logs in accordance with the tests set out in the case law. Moore v. Sanborne, 2 Mich 519; Thunder Bay Booming Co. v. Speechly, 31 Mich 335; Collins v. Gerhardt, 237 Mich 38; Attorney General, ex rel. Director of Conservation, v. Taggart, 306 Mich 432.
"If the floating of logs in this portion of the Chippewa were possible, it would be only during periods of high water. From the evidence, this court finds that although it would be possible to float a log in this area, it could not be done without considerable difficulty and this court is convinced that the lumbermen did not float logs on this stretch without the use of dams to create an artificial head of water to wash the logs downstream. This conclusion is supported by the record of the proceedings of the board of supervisors for Mecosta county dated January 8, 1884 (exhibits 12-A and 12-B) wherein the said board sought to inquire into the activities of Hudson and Williams whose flooding of logs by use of dams damaged the bridges in the townships of Fork and Sheridan on the Chippewa river. The testimony of Clarissa Notts, age 95, taken at her home on October 26, 1965 (see transcript page 26), and the testimony of Charles London, age 79, taken August 22, 1966, confirm the fact that dams were used to flood the logs down this section of the Chippewa. Examination of exhibits 20-A, B, and C which are discharge measurements of the west branch of the Chippewa and exhibit 19, which contains profiles of the stream, support the determination that this area of the river, in its natural state, including periods of flood and high water, was not used to float logs. This court has compared the width and flowage figures of the south branch of the Pere Marquette river as set out in Attorney General, ex rel. Director of Conservation, v. Taggart, 306 Mich 432 (see page 434) with the width and flow figures in this case as set out in exhibits 19, 20-A, B and C during the *201 month of June for the years 1950 through 1953 which appear to be average. The Pere Marquette had a flow of 41.62 cubic feet per second. The Chippewa had an average flow of 14.8 cubic feet per second. The average width of the Pere Marquette during June was about 31 feet. The width of the Chippewa during March-May period would average that or more. (See cross-sections, Exhibit 19.) This court is well acquainted with the stretch of river in the Taggart Case and has made a visual comparison of the flow with that of the Chippewa immediately below Winchester dam. The comparison confirms the above figures that indicate a flow in the said Pere Marquette of from 2 to 3 times greater than the Chippewa. In the Taggart Case on pages 434 to 439, the court sets out a finding of facts that the only navigability of that stream in its natural state would be during periods of high water and even these periods were fraught with handicaps so that dams were built to facilitate floatage for most of the running of logs. The court further found that the Taggart Case was `close to the border line' and that the stream had the capacity for floatage only during spring floods or following heavy rains and then was limited to loose logs and ties of small or medium diameter. Although each case involving the question is to be determined upon the condition and capacity of the stream in question, it is valuable to compare capacity with other streams when direct evidence is limited. The comparison above set out leaves this section of the Chippewa below the capacity to float logs even in periods of high water.
"Therefore, after careful consideration of the testimony and the exhibits and application of law thereto, this court finds that the west branch of the Chippewa river between Tubbs lake and the present site of Winchester dam in its natural state is not a navigable stream within the exception made by PA 1961, No 146, § 13."
*202 T.M. KAVANAGH, J. (dissenting in part).
In 1934 the board of supervisors of Mecosta county granted to the department of conservation permission to dam the west branch of the Chippewa river at Winchester. The department of conservation authorized the construction of the dam after it had obtained title to or flowage easements on all of the property affected by the impoundment of the waters by Winchester dam. The flowage easements allowed the impoundment of the water not to exceed a level of 995.5 feet above sea level at the dam site. Construction of the dam was finished in 1955.
The water level was maintained at an average of 993.8 feet above sea level at the dam after the impoundment became operative and until about June 1960.
During the early years of the impoundment, the waterfowl, hunting, and fishing programs were successful. By 1959, however, the number of waterfowl had declined because the food and cover areas had rapidly deteriorated. A management plan was adopted by the game division of the department of conservation to prevent the situation from becoming too severe. The plan called for lowering the level of the impoundment of water 18 inches during the summer months each year for the purpose of exposing part of the bottom lands, thereby obtaining a favorable growth of vegetation and aiding the deterioration of undesirable wood in the water. This lowering of the water level is objected to by the plaintiffs in each action.
Certain persons owning property bordering on the Martiny lakes project brought an action in chancery to enjoin the department of conservation from lowering the water level as proposed. A temporary injunction was issued against the department of conservation. The chancery action was then held in *203 abeyance by agreement of the parties for the reason that a petition seeking the establishment of the level of the lake had been filed by the board of supervisors for Mecosta county, giving rise to the second case considered here, which case could determine the outcome of both cases.
The second case is an action at law based upon the inland lake level act of 1961.[1] Upon petition of 40 landowners, the Mecosta county board of supervisors adopted a resolution on August 14, 1961, instructing the drain commissioner, among other things, to hire private counsel to carry out proceedings under the inland lake level act of 1961, so as to have established the level of the waters in the Martiny lakes project. On August 18, 1961, the petition was filed and a hearing was set for December 11, 1961. The department of conservation made a motion to dismiss. Testimony was taken and exhibits were received at the hearing on the motion.
The circuit court rendered an opinion dated March 29, 1962, denying the motion to dismiss and holding the normal level of the water was 993.8 feet above sea level at the dam site. However, the court allowed the department of conservation to lower the water level from autumn through spring, but denied the department's request to lower the level during the summer months. A judgment was entered in accordance with the opinion.
The chancery case was then dismissed, pursuant to the motion made by the department of conservation. Objections were filed by the department of conservation to the judgment in the law action, and appeal was taken therefrom. Plaintiffs appealed from the dismissal of the chancery case. The cases were consolidated on appeal.
*204 In the Supreme Court, after oral argument, the law action was remanded to the Mecosta county circuit court for taking additional testimony and filing a supplemental opinion by that court, limited to the question of whether the west branch of the Chippewa river between Tubbs lake and Winchester dam was in its natural state a "navigable stream" within the exception made by section 13 of the inland lake level act of 1961. The chancery case was again held in abeyance.
After taking the testimony and considering the exhibits, the circuit court rendered its supplemental opinion and judgment, finding the west branch of the Chippewa river between Tubbs lake and the present site of the Winchester dam was not in its natural state a "navigable stream" within the exception made by the inland lake level act.
Pursuant to the original order of remand, the case was certified to this Court.
Section 13[2] of the inland lake level act of 1961 provides as follows:
"Nothing herein contained shall be construed to alter, limit, abridge or amend the provisions of law applicable to the location, construction and maintenance of dams in navigable streams or provide for the determination, establishment or maintenance of the level of waters impounded by such dams." (Emphasis added.)
The only question in the law case is whether section 13 quoted above makes inapplicable the inland lake level act of 1961 to the Martiny lakes project in Mecosta county.
The determination of the ultimate question turns on: first, a question of law  what is a "navigable stream"?; and second, a question of fact  does the *205 portion of the Chippewa river herein concerned come within the scope of that definition?
In the case of Moore v. Sanborne (1853), 2 Mich 519 (59 Am Dec 209), the test of navigability is found at pp 525, 526:
"The servitude of the public interest depends rather upon the purpose for which the public requires the use of its streams, than upon any particular mode of use  and hence, in a region where the principal business is lumbering, or the pursuit of any particular branch of manufacturing or trade, the public claim to a right of passage along its streams must depend upon their capacity for the use to which they can be made subservient. * * *
"But it is urged that conceding such to be the rule, if a stream be not capable of being used to float mill logs, in an ordinary stage of water, it is not subject to the servitude of the public interests. * * * It is a valuable, rather than a continual use, which determines the public right. * * * `The law nowhere defines the character of a stream by admeasurement of its volume.'" (Emphasis added.)
The rule in Sanborne is that waters take on a public character when they are capable of being used for a "public purpose," and further that the public use need not be continual but must be valuable. The Court, looking at the logging industry, saw a great public use at that time. It then determined which streams could be used for that particular public purpose.
The definition of navigable waters was not limited in that or any other case to tests for floating logs or any other commercial use. Other public uses have always been and still are recognized.
In the case of City of Grand Rapids v. Powers (1891), 89 Mich 94 (28 Am St Rep 276), the Court was speaking of the Grand river in the city of Grand Rapids and stated (p 97):
*206 "Small steam-boats have run between the mouth and the city of Grand Rapids, and, with the aid of government appropriations, the river below the rapids at that city may be a water-way of great commercial utility; but above the rapids it has nearly served its usefulness as a navigable stream, except for small pleasure boats. The running of logs, lumber, and timber upon it is no longer of consequence, on account of the exhaustion of the forest supply of easy access to it and its tributaries. But it will ever be an important public stream, and its navigability for pleasure is as sacred in the eye of the law as its navigability for any other purpose." (Emphasis added.)
With changes in economic and social conditions, our rule of navigability has been rephrased but remains the same for all intents and purposes. Exemplary of the foregoing statement is the landmark case of Collins v. Gerhardt (1926), 237 Mich 38. The Court there stated (p 42):
"In view of modern social and economic conditions, and the flexibility of the common law in adapting itself to the changing needs of the people, we shall not consider the term navigability in a too technical commercial sense, or seek out some ancient test in determining if Pine river belongs in the class legally regarded as public waters. It has been said that:
"`The right of the public use in American rivers and streams depends, not upon their navigability, in the technical sense of the term, as defined by the common law.' Carter v. Thurston, 58 NH 104, 106 (42 Am Rep 584).
"`And:
"`If under present conditions of society, bodies of water are used for public uses other than mere commercial navigation, in its ordinary sense, we fail to see why they ought not to be held to be public waters, or navigable waters, if the old nomenclature *207 is preferred.' Lamprey v. State, 52 Minn 181, 199 (53 NW 1139, 18 LRA 670, 38 Am St Rep 541)." (Emphasis added.)
The Court further stated (p 43):
"Here, every stream that is navigable in fact is navigable in law." (Emphasis added.)
A further study of the cases cited in Collins, supra, reveals the following language in Lamprey v. State of Minnesota, supra (pp 198-200):
"It is proper to consider what is the definition or test of `navigability,' as applied to our inland lakes. The division of waters into navigable and nonnavigable is but a way of dividing them into public and private waters,  a classification which, in some form, every civilized nation has recognized; the line of division being largely determined by its conditions and habits.
"In early times, about the only use  except, perhaps, fishing  to which the people of England had occasion to put public waters, and about the only use to which such waters were adapted, was navigation, and the only waters suited to that purpose were those in which the tide ebbed and flowed. Hence, the common law very naturally divided waters into navigable and nonnavigable, and made the ebb and flow of the tide the test of navigability. In this country, while still retaining the common-law classification of navigable and nonnavigable, we have, in view of our changed conditions, rejected its test of navigability, and adopted in its place that of navigability in fact; and, while still adhering to navigability as the criterion whether waters are public or private, yet we have extended the meaning of that term so as to declare all waters public highways which afford a channel for any useful commerce, including small streams, merely floatable for logs at certain seasons of the year. Most of the definitions of `navigability' in the decided cases, *208 while perhaps conceding that the size of the boats or vessels is not important, and, indeed, that it is not necessary that navigation should be by boats at all, yet seem to convey the idea that the water must be capable of some commerce of pecuniary value, as distinguished from boating for mere pleasure. But if, under present conditions of society, bodies of water are used for public uses other than mere commercial navigation, in its ordinary sense, we fail to see why they ought not to be held to be public waters, or navigable waters, if the old nomenclature is preferred. Certainly, we do not see why boating or sailing for pleasure should not be considered navigation, as well as boating for mere pecuniary profit.
"Many, if not the most, of the meandered lakes of this State, are not adapted to, and probably will never be used to any great extent for, commercial navigation; but they are used  and as population increases, and towns and cities are built up in their vicinity, will be still more used  by the people for sailing, rowing, fishing, fowling, bathing, skating, taking water for domestic, agricultural, and even city purposes, cutting ice, and other public purposes which cannot now be enumerated or even anticipated. To hand over all these lakes to private ownership, under any old or narrow test of navigability, would be a great wrong upon the public for all time, the extent of which cannot, perhaps, be now even anticipated." (Emphasis added.)
The Collins Case was reaffirmed by this Court in the case of Kerley v. Wolfe (1957), 349 Mich 350. Justice BLACK, writing the unanimous opinion of the Court, stated (p 355):
"It is quite consistent with testimony and finding that the waters extending from plaintiffs' premises to the deeper part of the lake were and are navigable in fact by small boats and canoes. (Emphasis added.) *209 Of this fact he held (p 356):
"Such part of the lake being navigable in fact is navigable in law (Collins v. Gerhardt, 237 Mich 38, 43)." (Emphasis added.)
He further stated (p 357):
"It is the doctrine of riparian rights, the essence of which is that no upper or lower proprietor may dispute passage by water of his riparial neighbor when the stream or lake commonly enjoyed by all has been made navigable in fact by nature." (Emphasis added.)
We have a definition of navigability which is sufficiently flexible to apply to the revolutionary changes of life in Michigan  past, present, and future. The broadness of the rule is shown in Attorney General, ex rel. Director of Conservation, v. Taggart (1943), 306 Mich 432. It states (pp 441, 442):
"Many decisions following the Sanborne Case clearly distinguished between streams navigable for boats and those floatable for logs and, with respect to the latter, gave the public an easement of passage for the purpose of floatage and only such other rights as are incidental thereto. (Citing cases.) While the Sanborne Case only disposed of the right of floatage and did not decide that a floatable stream has the status of waters navigable for all purposes, the public character of water was held to be determined by reference to the public necessity for its use. It is this broad underlying principle rather than the narrow rule of the Sanborne Case which was in effect adopted by the court in Collins v. Gerhardt, supra, when it held that floatability determined the public character of a stream and affixed therein the public right of fishing. Whatever criticism may be made of the Collins Case because of its lack of authority, we believe it states sound law and *210 a public policy appropriate to the character of this State." (Emphasis added.)
The plaintiffs here contend the rule to be followed in determining navigability is that in Shepard v. Gates (1883), 50 Mich 495. In Shepard an objection was made that no permission had been given by the board of supervisors for building a bridge. The Court held permission from the supervisors was not required because it didn't appear that the branch of the river in question was used for any valuable boat or vessel navigation. It held further that the constitutional provision,[3] that no navigable stream should be bridged or dammed without authority from the board of supervisors, was adopted pursuant to the Ordinance of 1787, which stipulated that "the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and forever free." Of the Ordinance of 1787, the Court said (p 497):
"That has been considered as referring to navigation in its proper sense by some sort of boats used as means of carriage. At the date of the Ordinance the largest portion of the carrying trade in the Northwest was conducted in moderate sized boats, and the cargoes, and sometimes the boats themselves, were taken across the portages or carrying places dividing one stream or stretch of navigable waters from another. The legislature of 1851 so construed the Constitution, by confining the necessity of special leave from the supervisors for constructing bridges to streams navigable by boats or vessels of 15 tons burden or more, while the supervisors were authorized to make general regulations in regard to shallower streams. Act 156 of 1851, §§ 23, 24."[4] (Emphasis supplied.)
*211 Section 13 of the inland lake level act of 1961 speaks of streams only in terms of "navigable". It does not state any intention to limit itself to streams navigable for any particular purpose. If the legislature meant something different than the broad flexible definition of "navigability" used in Sanborne, supra, and adopted in Collins, supra, Taggart, supra, and Kerley, supra, it would have so stated, as it did in the statute considered in Shepard, supra. There one section of the statute dealt with the procedures to be followed whenever any one wished "to construct any bridge across any stream at a point where the same is navigable for boats or vessels of 15 tons burden or more", and another section of the statute gave boards of supervisors power to make general rules and regulations concerning bridges when the stream is not navigable for boats or vessels of 15 tons burden or more.
The test for navigability to be applied is the enlarged test set out in Sanborne, supra, adopted in Collins, supra, and Taggart, supra, and reaffirmed by Justice BLACK'S opinion in Kerley, supra. That test involves a determination of what the public purpose is and whether the stream is capable of use for that purpose. If the stream is, in fact, capable of use for the public purpose, it is viewed as public or navigable if the old nomenclature is preferred. If navigable in fact, it is navigable in law.
Applying the aforementioned test, we must ascertain whether the past, present, and possible future uses of this stream measure up to the test of "public purposes" and whether the trial court properly applied this test to the facts.
In the instant case, the trial judge upon remand took voluminous testimony. His opinion, however, reached an erroneous ultimate conclusion as to navigability *212 in fact because he erroneously adopted a constrictive "floatability of logs" test.
The basic public purpose for which our lakes and streams are used in this day and age clearly are not commercial in the sense that commerce is strictly defined. Commercial travel by boats and canoes is obsolete and other modes of transportation are now in vogue for economic reasons of cost, time, and facility of travel. Wholesale movement of logs via floating on lakes and streams is also obsolete and has been for so long that it is difficult to locate persons who have first-hand knowledge of whether logs were ever floated down a particular stream to the great lumber mills of the late 1800's.
We must at this point examine the ultimate fact of navigability under the "public purposes" test. That we may do so should be unquestioned. See Callihan v. Talkowski (1963), 372 Mich 1, 6, citing Schneider v. Pomerville (1957), 348 Mich 49. The United States Supreme Court considering an identical situation stated in United States v. Appalachian Electric Power Company (1940), 311 US 377, 403, 404 (61 S Ct 291, 85 L Ed 243):
"In cases involving the navigability of water courses, this Court, without expressly passing on the finality of the findings, on some occasions has entered into consideration of the facts found by two courts to determine for itself whether the courts have correctly applied to the facts found the proper legal tests. * * * Both the standards and the ultimate conclusion involve questions of law inseparable from the particular facts to which they are applied." (Emphasis added.)
Turning to the transcript of the proceedings upon remand, the weight and sufficiency of the evidence overwhelmingly preponderate in favor of the fact of navigability as above defined. George Moorman, *213 a witness for appellee, stated upon cross-examination that he waded and fished this stream:
"Q. Did you ever wade the stream?
"A. Yes, sir, I have waded it.
"Q. Did you fish it? * * *
"A. To spear with a gas lantern, yes, same way.
"Q. Well, I suppose, then, you could wade it all the way along, could you?
"A. No, there is places you couldn't wade it, of course. By the beaver dam you couldn't wade. It's four feet of water. I'm sure my legs aren't that long to wade it with what mud is in the bottom."
This testimony of spearfishing and wading is fully corroborated by witnesses for both sides.[5] In fact the department of conservation indicated on a separate record that it had planted and spawned fish in this stream at least as early as 1933.
Further, many witnesses testified as to the navigability by boat. Cash Wosner testified in respect to a boat trip taken in April 1954:
"Well, the only thing is that the ease with which that boat and motor made the run from Tubbs lake to the vicinity of the dam and back and the speed which it was run and the caution that Miller, an old commercial fisherman from Saginaw boats, managed in the water constantly checking the depth of the water with a pole to make sure he didn't run aground with the motor. My  It's a guess that we had at least three feet of water most all the way down there. We turned around and came back with the motor running at least two-thirds or three-quarter speed."
This testimony is also amply corroborated as every witness for both parties stated that they had *214 personally used, or had seen the use of, wood and aluminum boats on this stretch of the stream.
Although not necessary to a decision in this case, even if we consider the "floatability" test erroneously followed by the trial judge, there is evidence that logs three feet in diameter could float down this stream. In fact one witness, Warren Loomis, helped extract a "deadhead" log:
"Q. Now, did you see any deadhead logs in the stretch of the river?
"A. Oh, yeah. Yeah, we got on one sandbar and the fellow that [had] taken one out, and we stopped and helped him, and he pulled the log out and we went on up almost to the lake, and we come back."
This, again, is amply corroborated by witnesses for both parties.[6]
Added to all of this testimony are the scientific measurements and data compiled by the United States Department of the Interior Geological Survey covering a period from June 1950 to July 1955 and indicating the maximum and minimum depths, velocity, and water levels.[7] Also the transcript testimony discloses personal observations and activities of witness Louis Robinson concerning the 7-foot level of high water, of witness Irwin Austin in trapping beaver, muskrats, and mink and fishing, and of witness Warren Loomis as to duck hunting.
While not conclusive as a matter of law, this testimony, selected from an abundant source of corroborating testimony, conclusively shows the nature and extent of the presently existing "public purposes" on the west branch of the Chippewa river.
On the other hand, the only testimony offered against the fact of navigability related primarily to *215 the existence of sandbars and other natural obstructions and to the shallow waters during the summer months.[8] But we must point out, as did the United States Supreme Court in Economy Light & Power Company v. United States (1921), 256 US 113, 122 (41 S Ct 409, 65 L Ed 847), that:
"Navigability, in the sense of the law, is not destroyed because the watercourse is interrupted by occasional natural obstructions or portages; nor need the navigation be open at all seasons of the year, or at all stages of the water."
See, also, The Montello (1874), 87 US (20 Wall) 430 (22 L Ed 391), citing Moore v. Sanborne (1853), 2 Mich 519.
We conclude, as we did in Callihan v. Talkowski, supra, at page 6, that the trial court did not test the factual situation in the light of the proper rule of law.
The west branch of the Chippewa river within the area in question is capable of being used for these public purposes. Fishing was a common pastime in the area before the construction of Winchester dam. The facts show this stream is capable of being waded, fished, and boated, and there is sufficient water in which to frolic around.
From the record as a whole, we can reach only one conclusion of ultimate fact  that this stream is navigable in fact. If navigable in fact, it is navigable in law.
As this water course is navigable, the inland lake level act of 1961 does not apply.
The plaintiffs in the chancery case executed easements of flowage to the department of conservation, which in pertinent part read:
*216 "Convey unto the State of Michigan * * * the full and free right and authority forever to flow, flood, and impound water to a height not to exceed 995 feet 6 inches above sea level at the dam over and upon the following described land."
The plaintiffs now object to the lowering of the water to a level below that authorized by the flowage easements, not to raising the water level above 995.5 feet. The case is controlled by Drainage Board v. Village of Homer (1957), 351 Mich 73. It is fatal to the plaintiffs' case as, by execution of the flowage easements mentioned above, they sold their rights to object to the raising or lowering of the water level within the limits described in the instruments.
The judgment of the circuit court in the law action should be reversed and its decree in the chancery case is affirmed.
A public question being involved, no costs are allowed.
ADAMS, J., did not sit.
NOTES
[1] We shall refer to it hereafter as "the act of 1961."
[2] "Sec. 13. Nothing herein contained shall be construed to alter, limit, abridge or amend the provisions of law applicable to the location, construction and maintenance of dams in navigable streams or provide for the determination, establishment or maintenance of the level of waters impounded by such dams."
[3] Sections 21 and 22 of the act of 1851 ultimately became sections 1143 and 1144 of the compiled laws of 1929. The official citation now is CL 1948, §§ 46.21, 46.22. CL 1948, § 46.22 has been amended by PA 1951, No 36.

The act of 1851 was entitled:
"An act to define the powers and duties of the boards of supervisors of the several counties, and to confer upon them certain local, administrative and legislative powers."
[4] Justice SHERWOOD, elected to the Court shortly before submission of Shepard v. Gates on April 12, 1883, did not take his seat until April 19, 1883. He became the 4th member of the Court in the place of Justice MARSTON, resigned. 50 Mich ii, iii.
[5] The attorney general is even more determined than this. He would extend the statutory term "navigable" to feeder streams, right up to the source at bubbling spring or seep.
[6] "Flat river is a stream valuable for floatage, but not for navigation in the more enlarged meaning of the term." (Middleton v. Flat River Booming Co. [1873], 27 Mich 533, 535).

"It is admitted that St. Joseph river, above Berrien Springs, is navigable only in a qualified sense." (Valentine, ex rel. Dudley, v. Berrien Springs Water-Power Co. [1901], 128 Mich 280, 289).
[7] In this case the Supreme Court accepted a finding of fact "that the Rio Grande river was not navigable within the limits of the Territory of New Mexico," basing its ruling upon a number of authorities with this conclusion (pp 698, 699):

"And again [citing The Montello (1874), 87 US (20 Wall) 430, 442 (22 L Ed 391)]: `It is not, however, as Chief Justice Shaw said [Rowe v. Granite Bridge Corporation (1838), 38 Mass 344, 347]: "every small creek in which a fishing skiff or gunning canoe can be made to float at high water which is deemed navigable, but, in order to give it the character of a navigable stream, it must be generally and commonly useful to some purpose of trade or agriculture."'"
[8] "The only question is whether Congress has required a license for a water power project utilizing the headwaters [of `a nonnavigable tributary'] of a navigable river to generate energy for an interstate power system. We think an affirmative answer is required by both the language and purposes of the act." Federal Power Commission v. Union Electric Co., supra, 95.
[9] In a recent issue of the conservation department's magazine Michigan Conservation (January-February 1968, volume 37, No 1, pp 31, 32), the department's declared "1968 legislative objectives" include this:

"(17) Amend lake level act (PA 1961, No 146). Clarifying amendments are proposed to sections 6, 10, 12, 13, and 25 to avoid confusion."
[1] PA 1961, No 146 (CLS 1961, § 281.61 et seq. [Stat Ann 1961 Cum Supp § 11.300(1) et seq.]).
[2] CLS 1961, § 281.73 (Stat Ann 1968 Cum Supp § 11.300[13]).
[3] Const 1850, art 18, § 4.
[4] CL 1948, §§ 46.23, 46.24 (Stat Ann 1961 Rev §§ 5.346, 5.347).
[5] See transcript testimony of witnesses Louis Robinson, Roland Green, Warren Loomis, and George Belden.
[6] See transcript testimony of witnesses Gallenger, Louis Robinson, Charles Robinson, Green, Loomis, London, Austin, and Jansma.
[7] See exhibits 20 A-B-C and transcript testimony of Kenneth Jansma, a civil engineer for the department of conservation.
[8] See the testimony of witnesses Moorman, Riley, Ball, and Gallenger.