ATTORNEY GENERAL, *ex rel.* DIRECTOR OF
CONSERVATION, *v.* TAGGART.
SAME *v.* BIG RAPIDS LAND & DEVELOPMENT CO.

1. FISH—FLOATABILITY OF LOGS.
   Floatability of logs determines the public character of a stream
   and affixes therein the public right of fishing (2 Comp. Laws
   1929, ¶ 6425).

2. WATERS AND WATERCOURSES—SMALL STREAMS—PRIVATE LAKES—
   RIPARIAN RIGHTS.
   Small trout streams on private property which have not been
   used by the public for logging or for boating and private
   lakes and ponds owned by the abutting property owners are
   under the complete control of the riparian owner.

3. NAVIGABLE WATERS—FLOATABILITY OF LOGS—PLANTING FISH—
   BARRIERS.
   Stream flowing upwards of 41 cubic feet per second, which aver-
   ages over 30 feet wide and nearly a foot deep, which is very
   winding and has many sharp turns but is usable for floating
   logs during periods of high waters and in which the public
   has fished for the past 50 years and upwards and in which
   State has planted trout with the knowledge and consent of
   riparian owners who excavated deep pits where stream entered
   and left their premises, is required to be restored to previous
   condition, such stream being a navigable one in which the pub-
   lic has a right to fish (2 Comp. Laws 1929, § 6425).

4. COSTS—PUBLIC QUESTION—BARRIERS IN NAVIGABLE WATERS—
   FISH.
   No costs are allowed in suit to enjoin riparian owners from
   preventing the public from fishing in a navigable stream by

(432)

erection of barriers where stream enters and leaves the property, a public question being involved.

WIEST, J., dissenting.

Appeal from Newaygo; Pugsley (Earl C.), Evans (Fremont), and Dehnke (Herman), JJ., presiding. Submitted April 16, 1943. (Docket No. 47, Calendar No. 41,888.) Decided October 11, 1943.

Separate bills by Attorney General, on relation of Director of Conservation, and Herbert W. Davis against William Clinton Taggart and wife and Big Rapids Land & Development Company, a Michigan corporation, to restrain obstruction and dredging of the Little South Branch of Pere Marquette River. Cases consolidated for trial. Decrees for defendants. Plaintiffs appeal. Reversed.

*Herbert J. Rushton,* Attorney General, *Edmund E. Shepherd,* Solicitor General, *Kenneth G. Prettie* and *John Bradshaw,* Assistants Attorney General (*Willis B. Perkins, Jr.,* of counsel), for plaintiff Attorney General.

*Willis B. Perkins, Jr.,* for plaintiff Davis.

*Worcester & Worcester* and *William J. Bránstrom* (*T. R. McNamara,* of counsel), for defendants.

BUTZEL, J.    Plaintiffs appeal from decrees entered in the circuit court for the county of Newaygo in chancery in two cases involving almost the same state of facts. The cases were combined and heard together and come here on one record and set of briefs. They were heard by the Honorable Earl C. Pugsley, Fremont Evans and Herman

Dehnke, Circuit Judges, sitting *en banc*. Each wrote a separate opinion, Judge Evans upholding the principles set forth in *Collins* v. *Gerhardt*, 237 Mich. 38, while Judges Pugsley and Dehnke distinguished that case and denied the right to the public to fish in the particular stream involved in the instant cases.

Defendant Big Rapids Land & Development Company owns section 5 and defendant Taggart section 6 of Home township in Newaygo county. The sole question is whether the public has a right to fish in that portion of the Little South Branch of the Pere Marquette River which meanders in a northwesterly direction across these two sections for an aggregate distance of nearly three miles. We cannot improve upon the concise and clear statement of facts of Judge Dehnke's opinion, in which Judge Pugsley also concurred. We quote from the opinion as follows:

"In June, 1940, when the water ran somewhat higher than normal, this stream had a flow of 41.62 cubic feet per second where it enters these lands, and 48.62 cubic feet per second where it leaves them. Its average width was 30.45 feet through section five and 32.45 feet through section six. Its average depth was 1.065 feet through section five and .911 feet through section six, according to defendants' witnesses, slightly more according to plaintiffs'. It is very winding with many sharp turns, with the result that for much of the distance the water is much deeper on one side and shallower on the other than the average depth. There are places where the shallow water stretches clear across for some distance. During spring rains and other freshets it attains a depth of as much as 3 to 4 feet for short periods of time, in places.

"Claiming the stream to be nonnavigable and not open to public fishing, defendants in the spring

of 1940 drove sheet piling along each side of the stream for some distance and then excavated the channel between the piling to a depth of 7 or 8 feet, both where it enters and where it leaves the sections mentioned, admittedly for the purpose of making it impossible for fishermen to enter by wading. It is their claim that they have done nothing to impede navigation, and that in any event they had a right to maintain the condition mentioned for the purpose of preventing trespass upon their property. These suits were instituted by plaintiff Davis, as a private citizen asserting the right to fish in this portion of the stream, and the attorney general acting in behalf of the director of conservation and general public, for the purpose of obtaining an injunction against defendants prohibiting them from maintaining the condition just described, on the theory that the stream at the point in question is 'navigable' because 'floatable,' and, being 'navigable' is open for public use, including the taking of fish therefrom, under the Ordinance of 1787 and the decisions in *Collins* v. *Gerhardt,* 237 Mich. 38, and *Ne-Bo-Shone Ass'n* v. *Hogarth* (C. C. A.), 81 Fed. (2d) 70, 7 Fed. Supp. 885 (hereinafter referred to as the Pine River cases), in which the stream under consideration had approximately three times the volume of flow at the point in question as that here involved.

"The attorney general takes the position, in substance, that in the Pine River and some other cases, our Supreme Court has definitely declared that the right to fish depends on the stream being a 'navigable' stream, and that a stream is 'navigable' if it is 'floatable.' Counsel for the individual plaintiff goes further and contends that 'navigability' is but one test by which it may be determined whether a stream is 'public;' that even though a stream may not be and may never have been 'navigable,' it is nevertheless public if it is capable of any beneficial or enjoyable use by the public, or

can be made so by means which do not substantially alter natural conditions; that this stream (which in this opinion means that portion of it here under consideration, unless otherwise indicated) is naturally well adapted for fish and fishing, and has been improved in these respects by the planting of fish, et cetera, by the public authorities, and is therefore open to public fishing and other public uses, regardless of 'navigability.'

"In various ways, it has been sought to impress upon the court the thought that this is an extremely important case, upon the outcome of which depend the rights and privileges not only of the immediate parties, but of many others, and the status of all other streams within the State. Upon the one side are pictured the defendants and other land owners, along this and other streams, with substantial investments, whose privacy is being invaded and who suffer from repeated acts of vandalism committed by individual fishermen, of such a nature as to interfere seriously with their peaceful and beneficial enjoyment of their properties. On the other side are supposed to be arrayed the multitudes who like to fish, ranging from those who are only mildly interested in roaming where the spirit moves through 'God's Great Outdoors,' to such as are completely persuaded that the privilege of fishing is the highest boon of happiness and bliss within the compass of mortal man's imagination; and these are supported by others whose personal sympathies or professional and personal activities will be gratified or promoted by extending the areas open to the public. It has been well said: 'For a party (and sometimes for his counsel), litigation has more refractory power than any other medium.' Human nature being what it is, all those definitely interested in the outcome as partisans of either side tend to become victims of an autogenous hemiopia rooting in their

personal emotions, which firmly establishes the con-
viction that their own side is obviously and com-
pletely right, and, we apprehend, causes both sides
to wonder why any Court should require time for
research and deliberation.

"It seems clear that the effect of this decision
with respect to other streams has been considerably
overestimated.   Certainly it can be no more
effective in settling the issue as to other streams
than have been the Pine River cases.   It will re-
main true that as to each stream and section of it,
this issue, if raised, is one to be determined upon
its own condition, capacity, and history.   This case
will not even, in and of itself, determine definitely
the status of this particular stream in its entirety.
If this portion of it is held to be open to public
fishing, it probably will, from a practical stand-
point, determine that the stream below this point
is also open; if held not open to public fishing, it
probably will determine that the stream above this
point is also not open.

"It is also argued that, from a practical stand-
point, the privilege of fishing a stream under the
restrictions which plaintiffs admit now exist is of
but limited value.   The fisherman must be content
to wade; he may enter or leave the stream only
where it touches a public highway or other public
property; as applied to this stream, if he wants to
fish the length of it, he must remain in it for a
distance of nearly three miles; he may walk only
on the subjacent, not on the adjacent, soil of the
riparian owner; if, in entering or leaving, or to
avoid an obstruction or deep hole in the stream,
or for any other purpose, however urgent or
pressing, he steps upon the bank, he is guilty of a
trespass.   It is conceded that in this State, the title
to the soil on both sides of the stream and to that
under the water is in the riparian owner. * * *

"This stream is concededly not navigable in the
sense of commercial travel by any kind of boat.
There is a difference of opinion among the wit-

nesses as to whether it is practical to use a boat on it in fishing. Many portions of it would carry a boat occupied by a fisherman, in others the occupant would have to get out, wade, and push the boat, and in still others he would have to lift or carry it over obstructions or shallow places, at least during periods of normal water height.

"It can be fairly said that the maximum and only 'navigability' of this stream in its natural state would be during periods of high water and confined to floating of logs and ties run loose, not tied together in rafts; and because of many sharp bends it would require a man at many of the turnings to keep the logs moving, otherwise they would jam. The jamming would usually automatically and naturally create an increase in the depth of water and enable expert rivermen to break the jams and thereby run the logs over the shallows without artificial dams. Save possibly as to ties, the floatage in this stream in its natural state and even at stages of high water was fraught with many handicaps, and early in the logging history of the stream dams were constructed at strategic points both above and below the land in question to render more easy, rapid and economical its use for floatage purposes. Most of the running of logs was in fact done with the aid of dams and consequent increased depth sustained over greater periods of time than normally, although some of those who appeared as witnesses in this 'battle of the ancients' concerning the capacity of the stream in the ' '70's and '80's' insist that it was never possible to run logs down the stream without the use of dams.

"The court finds that although the case is close to the border line—very much nearer than the stream considered in the Pine River cases,—this stream has what the cases describe as 'the capacity of floatage,' but only during the spring seasonal periods of high water, or at other short periods

following upon heavy rains, and limited to loose logs, ties, and similar products of small or medium diameter.''

To these facts should be added the further statement that the public has been fishing in this stream for the past 50 years and upwards. No claim is made that the public has a right to walk or trespass on the banks or the lands of defendants bordering the stream. The State of Michigan through its conservation department and other officers has for the past 40 years planted trout in this stream. During the years shortly preceding the filing of the bills of complaint in this suit, many thousands of brook trout and brown trout were planted. The expense to the State is not shown but it is generally known that a very large sum of money is required to furnish the facilities and labor for propagation, raising and planting of these trout. Act No. 121, Pub. Acts 1891 (1 Comp. Laws 1929, § 6425 [Stat. Ann. § 13.1681]), provides as follows:

"SECTION 1. That in any of the navigable or meandered waters of this State where fish have been or hereafter may be propagated, planted or spread at the expense of the people of this State or the United States, the people shall have the right to catch fish with hook and line during such seasons and in such waters as are not otherwise prohibited by the laws of this State.''

The stream in the instant case cannot be used for boating. There are very shallow spots and portage in a limited sense would be necessary in order to use a boat. The only way that the public can now fish upon the water is by wading and entering the stream from either end of defendants' properties. Deep excavations have been made by

defendants at the respective termini of that part of the river traversing their joint properties. This excludes the public from fishing as effectively as if durable barriers had been erected. Appellants claim that navigability is determined by the capacity of a stream for floating logs even though its use for that purpose has been abandoned and that a stream that has been used for floating logs is navigable and, therefore, open to the public for fishing. Appellants rely principally upon *Collins* v. *Gerhardt, supra,* and upon *Ne-Bo-Shone Association* v. *Hogarth* (C. C. A.), 81 Fed. (2d) 70. In the former case, we held that all streams were navigable which in their natural state were capable of floating logs and that one acquiring title to the bed of navigable waters held it subject to a perpetual trust to secure to the public their rights of fishing and navigation. In the *Ne-Bo-Shone Case,* the United States circuit court of appeals for the sixth circuit held that *Collins* v. *Gerhardt, supra,* in recognizing that floatability determined the public character of a stream, did not overturn an established rule of property in this State.

Some effort is made to distinguish the facts of *Collins* v. *Gerhardt, supra,* from those in the instant case. There may be some question of degree but not of principle. Pine River, considered in the *Collins* v. *Gerhardt* and *Ne-Bo-Shone Cases,* is somewhat wider than the Little South Branch of the Pere Marquette River, but practically the same questions were raised then as appear in the instant case. All three judges agree that the stream had been used for floating logs when the water was high because of spring freshets or a heavy rainy season. If the principle set forth in *Collins* v. *Gerhardt, supra,* is correct, that case governs the facts in the instant case. The majority opinion, however, claims

that *Collins* v. *Gerhardt, supra,* should be overruled because it is an "orphan." Even if it is, such status will cease to exist if it is reaffirmed and adopted by this court in the cases at bar.

Our attention has been called to some four score cases. It must be conceded that if strict precedent were to be followed by our adopting statements in certain cases prior to *Collins* v. *Gerhardt, supra,* we would be inclined to hold that merely floatable streams are not subject to general public uses, such as fishing. In *Moore* v. *Sanborne,* 2 Mich. 519 (59 Am. Dec. 209), the test of navigability for commercial vessels was found insufficient for determining the public character of waters for floating logs and consequently a broader test was evolved to meet the needs of an expanding pioneer industry. All waters were made subject to the servitude of the public interest which in their natural state were capable of floating logs. The common-law doctrine of the necessity of usage or custom to establish a public right was disposed of and the public interest came to depend rather upon the required use of the stream than upon any previous particular mode of use. Many decisions following the *Sanborne Case* clearly distinguished between streams navigable for boats and those floatable for logs and, with respect to the latter, gave the public an easement of passage for the purpose of floatage and only such other rights as are incidental thereto. *Middleton* v. *Flat River Booming Co.,* 27 Mich. 533; *Attorney General, ex rel. Muskegon Booming Co.,* v. *Evart Booming Co.,* 34 Mich. 462; *Koopman* v. *Blodgett,* 70 Mich. 610 (14 Am. St. Rep. 527); *City of Grand Rapids* v. *Powers,* 89 Mich. 94 (14 L. R. A. 498, 28 Am. St. Rep. 276); *Giddings* v. *Rogalewski,* 192 Mich. 319; *Winans* v. *Willetts,* 197 Mich. 512. While the *Sanborne Case* only disposed of the right of floatage

and did not decide that a floatable stream has the status of waters navigable for all purposes, the public character of water was held to be determined by reference to the public necessity for its use. It is this broad underlying principle rather than the narrow rule of the *Sanborne Case* which was in effect adopted by the court in *Collins* v. *Gerhardt, supra,* when it held that floatability determined the public character of a stream and affixed therein the public right of fishing. Whatever criticism may be made of the *Collins Case* because of its lack of authority, we believe it states sound law and a public policy appropriate to the character of this State.

We cannot overlook the fact that the public has continuously fished upon this property these many years and that it has been stocked with fish by the State of Michigan at a very large expense with the consent of the owners. Were the rule of *Collins* v. *Gerhardt, supra,* not the law, many or all of the larger fresh water streams, or large portions of them, in this State would be effectively closed to the public notwithstanding the enormous expense the State has been put to in stocking such streams. Michigan has always been known for its trout streams and has done much to attract fishermen. The State has annually appropriated large sums to advertise its resort and recreational advantages. (See Act No. 19, § 1, Pub. Acts 1941.) It has made appropriations from year to year for the fish division of the conservation department. (See Act No. 362, Pub. Acts 1941.)

Defendant Taggart, *et al.,* purchased the property after the decision in *Collins* v. *Gerhardt, supra.* It is not shown just exactly when the Big Rapids Land & Development Company purchased its property. One of the employees of the conservation depart-

ment, division of fisheries, testified that in every instance they tried to establish contact with the owner before planting fish; that in 1939, he obtained permission from defendant Taggart to plant brook trout in the river in section 6; that he discussed this also with the members of defendant Big Rapids Land & Development Company; that when he discussed it with Mr. Taggart, he told him what they were contemplating doing, and received his approval; that he also talked with the secretary-treasurer of the defendant land and development company. Notwithstanding the holdings of other courts that the stocking of fish by the public does not create a public easement in the use of the bed of a stream (*Albright* v. *Cortright,* 64 N. J. Law, 330 [45 Atl. 634, 48 L. R. A. 616, 81 Am. St. Rep. 504]; *Beach* v. *Morgan,* 67 N. H. 529 [41 Atl. 349, 68 Am. St. Rep. 692]; *Millspaugh* v. *Northern Indiana Public Service Co.,* 104 Ind. App. 540 [12 N. E. (2d) 396]·), it may be claimed that many of the elements of estoppel exist in the instant case. It is unnecessary to discuss this, however, for we base our decision squarely on the case of *Collins* v. *Gerhardt,* which we believe expresses the law of this State. This stream being navigable defendants' ownership of the bed is subject to the public right of fishing therein. *Collins* v. *Gerhardt, supra.*

The instant case does not in any way affect very small trout streams on private property which have not been used by the public for logging or for boating; *Burroughs* v. *Whitwam,* 59 Mich. 279; nor does it cover private lakes and ponds owned by the abutting property owners. As to such bodies of water, the riparian owner has complete control.

The decrees of the lower court are reversed. In each case a decree may be entered ordering defendants to remove all barriers from the termini of

their respective properties by restoring the bed of the river to such condition as it was before the excavations were made by defendants. The question being a public one, costs will not be allowed.

BOYLES, C. J. and CHANDLER, NORTH, STARR, BUSHNELL, and SHARPE, JJ., concurred with BUTZEL, J.

WIEST, J. (*dissenting*). The case should be affirmed. I join in the result of the opinion in the circuit court, rendered by Judges Pugsley and Dehnke, as set forth in Justice BUTZEL's opinion.

In connection with *Collins* v. *Gerhardt*, 237 Mich. 38, the opinion in *Nedtweg* v. *Wallace*, 237 Mich. 14, should be read.