Henry W. Lengyel, J.
This is a claim for the appropriation of claimant’s land pursuant to section 30 of the Highway Law, which proceeding is described as Alexandria Bay-Morristown, Part 2, St. Lawrence County, Map No. 39 Parcels Nos. 78, 79, 80, and 81.
By deed description the property contained .05± of an acre in Jefferson County and 915.75± acres of land in St. Lawrence County. Its boundaries were the St. Lawrence River on the west, Chippewa Bay on the north, the center of Crooked Creek on the east, and, generally, the St. Lawrence-Jefferson County line on the south. It was a very irregular parcel. As some lands had been sold out of this parcel, we accept claimant’s *75 appraiser’s land area of 877± acres at the vesting date. A total of 18 lots had been sold off the St. Lawrence River and Chippewa Bay frontage up to the vesting date. All of these lots fronted on or had a right of way to a gravel access road 10± feet in width, which was referred to as the Indian Point Road. Said private road extended from the Scribby Road (also known as the Boose Bay State Line Highway) westward to a point near the shore of the St. Lawrence River and then northward to a point near Chippewa Bay, for a total distance of 9,500± feet. Said property had 8,500± feet frontage on the St. Lawrence River and Chippewa Bay and 8,500± feet frontage on Crooked Creek. The frontage along the St. Lawrence River and Chippewa Bay consisted of hardland, with little slope to the water’s edge; rock ledge; and marsh. Approximately 5,000 feet of said frontage were in hardland on rock ledge, with the remaining 3,500± feet in marshland.
Crooked Creek is a slow flowing, meandering stream with its source in Jefferson County. It flows in a general northwesterly direction into St. Lawrence County and along the easterly boundary of subject property until it enters the St. Lawrence River at the south corner of Chippewa Bay. The stream varies in width from 75 feet near the Jefferson-St. Lawrence County line to about 175 feet at its mouth near Chippewa Bay. The frontage on Crooked Creek varies from rock ledge 20± feét above the water to slightly sloping hardland and marsh frontage. The hardland and rock ledge frontage totaled 3,000± feet and the marsh frontage 5,500± feet. The closest proximity of Indian Point Road to the creek was at the county line, a distance of 2,530± feet. The interior property was partly rolling hardland with brush and woods cover and low, marshy areas.
The highest and best use of subject property before the appropriation was for recreational development for both campsites and water front cottages on the rocky ledge and hardland, water frontage and recreational backup land for the marshland and the interior lands, which were a combination of marsh and rolling hardland.
Subject proceeding appropriated 54.586± acres of claimant’s property in fee without access, and applied permanent easements for drainage purposes to 0.209± acre.
The State appraiser found a before value of $130,000 (rounded) and the claimant’s appraiser found a before value of $156,200 (rounded). A part of this difference was the result of the State assigning value to 915 acres, or 38 more acres than presented in the claimant’s appraisal. As previously stated, we have accepted the claimant’s acreage of 877± acres. The princi *76 pal difference was caused by the allocations of value to Crooked Creek frontage, the interior lands and the marshlands. In fact, if the State had not allocated a substantially higher value to the St. Lawrence River frontage, the before values would have been appreciably more disparate. The following chart indicates the various before value allocations.
STATE
25 acres of St. Lawrence River frontage at $3,600
per acre.........................................$ 90,000
890 acres of wild life preserve at $45 per acre.......... 40,050
$130,050
CLAIMANT
25 acres of St. Lawrence River frontage at $2,000
per acre.......................°..................$ 50,000
15 acres of Crooked Creek frontage at $1,500 per acre.. 22,500
837 acres of recreation land, marshland and stream at $100 per acre..................................... 83,700
$156,200
We find that the 25± acres of St. Lawrence River frontage had a fair-market value both before and after the appropriation of $68,750. We agree with the claimant’s appraiser as to the use of the hardland and ledge along the Crooked Creek frontage. From our view of the area and the evidence presented, we find his allocation of 15± acres to such use to be reasonable. His was the only appraised value presented for such frontage; and, in our opinion, the Strait comparable sale substantiated his assigned value of $22,500. We, therefore, find $22,500 for said 15± acres. The marshlands and interior lands have an average acreage value of $75; or a total value of $62,775 for 837± acres. The total fair market value for subject property before the appropriation was $154,025.
The fee appropriation directly damaged 2± acres of Crooked Creek frontage and 52.586± acres of recreational backup land. The permanent easements directly damaged, by 90%, 0.209± of an acre of recreational backup land. The total direct damage sustained was $6,958 (rounded).
The State appraiser did not find any consequential damage to the remaining property. Claimant’s appraiser found that the property sustained a consequential damage of $22,775. Both appraisers agreed that the St. Lawrence River frontage was not damaged by the appropriation. The only viable consequential *77 damage assigned by the claimant’s appraiser to the remaining land west of the new highway was the cost of connecting Indian Point Road to the new access road built into the west section by the State. Claimant had to refurbish and resluice 200 to 300 feet of its private roadway. We accept the claimant’s figure of $350 for this cost to cure. The claimant’s appraiser also assigned some consequential damage for the new access driveway built by the State as it was public and not under claimant’s control. We do not so find. This is a relatively short driveway and claimant can still control its connection with the Indian Point Road as it did the prior connection with the Scribby Road.
Claimant’s primary consequential damage was attributable to the effect of Parcel 79 on the remaining Crooked Creek frontage and marshlands. Said parcel appropriated 1.007± acres of Crooked Creek, or all of that portion of Crooked Creek owned by the claimant at that particular location, in fee without access. It is claimant’s position that said appropriation deprives it of legal access from its untouched southeasterly Crooked Creek frontage to the St. Lawrence River; and, from the St. Lawrence River to said frontage. This parcel was appropriated for the purpose of constructing a bridge across Crooked Creek as an integral part of the new limited access highway. The problem presented would not have arisen if the State draftsmen had been more careful in their use of artful legal language. Instead of following their routine language of 11 fee without access ’ ’, it would not appear too difficult, when concerned with building a new bridge over a navigable or nonnavigable stream, to state that there was no intention to interfere with the use of said stream by riparian owners or others, except as the height of the bridge from the surface of the water might impede the totally unrestricted passage that originally existed.
Subdivisions 4 and 5 of section 2 of the Navigation Law set forth in broad language the criteria for establishing the navigability of a stream within New York State as follows: “ 4. £ Navigable waters of the state ’ shall mean all lakes, rivers, streams and waters within the boundaries of the state and not privately owned, which are navigable in fact or upon which vessels are operated ”.
“ 5. £ Navigable in fact ’ shall mean navigable in its natural or unimproved condition, affording a channel for useful commerce of a substantial and permanent character conducted in the customary mode of trade and travel on water * * * to be naviagable in fact a lake or stream must have practical usefulness to the public as a highway for transportation.”
*78 The question of navigability has been discussed and ruled upon in a myriad of cases. In Danes v. State of New York (219 N. Y. 67, 71) it was stated that “ to be navigable, it is not necessary that it should be deep enough to admit the passage of boats at all portions of the stream.” People ex rel. New York Cent. R. R. Co. v. State Tax Comm. (258 App. Div. 356, 361, affd. 284 N. Y. 616) quoted with approval from Economy Light Co. v. United States (256 U. S. 113) as follows: “ ‘ The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use. If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or highway.’ ”
In People ex rel. New York Cent. R. R. Co. v. State Tax Comm. (238 App. Div. 267, 268, affd. 268 N. Y. 510) it was stated that: “ Streams so shallow as to accommodate small size craft only are now determined to be navigable in fact. (United States v. Holt State Bank, 270 U. S. 49; People ex rel. Lehigh Valley R. Co. v. State Tax Commission, 247 N. Y. 9.).”
The court in Fairchild v. Kraemer (11 A D 2d 232, 235) stated: ‘ ‘ Under the correct test of navigability, the paramount factor to be considered is not the actual use to which a stream has been put, or the purpose of its use that is important, but rather its capacity for use and its susceptibility for use (in its original state' or condition) for trade, commerce or travel. The fact that a stream has been used for pleasure boating may be considered on the subject of the stream’s capacity and the use of which it is susceptible.”
Crooked Creek, according to claimant’s appraisal, had a minimum depth of six to eight feet and at least 8,500± feet of length in St. Lawrence County. From observation, it had two to three miles more of length in Jefferson County. During the ice-free seasons, it was traveled by pleasure boats and sport fishing-boats, mainly from the St. Lawrence Biver into the creek area and then out again into the river. Of course, if the property is developed as claimant plans, the creek will be well traveled by those living on it in season and by boating guests. We point out that, other than in the stream bank and stream bed area actually physically appropirated by the State, for which claimant will be compensated under this decision, the State has not in any way interfered with claimant’s access from its uplands to the stream flowing by said uplands. If the State has physically interfered with any rights of claimant, it is the right of *79 access from the uplands via this stream to the St. Lawrence River. To proceed from the uplands to the St. Lawrence River, claimant must navigate on Crooked Creek. We would consider it difficult for claimant to so navigafe on a nonnavigable stream. We do not believe that the decision of Gucker v. Town of Huntington (268 N. Y. 43) is, on its facts, pertinent to or dispositive of the fact situation presented in the case at bar. We believe that, under the circumstances presented, this must be considered a navigable stream; and, we so find. In Corpus Juris Secundum (vol. 65, Navigable Waters, § 89) it is stated: ‘1 Land under nontidal waters * # * belongs to the riparian owners, and an owner of adjacent land on either side of the stream owns to the center or thread of the stream. However, where such waters are navigable in fact, private ownership is subject to the right of the public to use the waters for passage and transportation, so that, as far as the public right is concerned, it is immaterial whether the title to the bed of a stream is in the sovereign or a private owner. ’ ’ (See, also, Fulton Light, Heat & Power Co. v. State of New York, 200 N. Y. 400, 412, mot. for rearg. den. 202 N. Y. 543.) Under the present situation the State now owns an area of the bed of Crooked Creek in fee without access. However, “ To whatever extent a state is found to own a stream bed, this ownership is held in trust for the benefit for the general public.” (1 Powell, Law of Real Property, § 160, p. 644.) (See, also, People v. New York & Ontario Power Co., 219 App. Div. 114; New York Power & Light Corp. v. State of New York, 230 App. Div. 338, 342.) The State cannot arbitrarily violate this trust without either being held liable in damages for such violation; or, being ordered, after a proper proceeding, to cease and desist such violation. Subject property was appropriated in January of 1965. We viewed the property in June of 1969, more than four years after the appropriation. Other than the effect of the new bridge upon the height of craft seeking to go under it; or, a possible narrowing of the channel spanned by the bridge, there was absolutely no indication of any intention on the part of the State to prevent access under this bridge. If the State should at some date in the future, ' other than for navigation purposes, interfere with this claimant’s, or its successors ’, rights to travel upon the waters of Crooked Greek, it or they could then have their day in court to protect those rights. (New York Power & Light Corp. v. State of New York, supra, p. 346; Jafco Realty Co. v. State of New York, 18 A D 2d 74, 75, affd. 14 N Y 2d 556; Clark v. State of New York, 20 A D 2d 182, 189, affd. mem. opn. 15 N Y 2d 990.) In our opinion, this fee without access appropriation *80 was related to the bridge which carried vehicular traffic and ‘ ‘ the without access ’ ’ did not apply to travel on the stream. If it did we would consider it a legal nullity. (See, Idylbrook Farms v. State of New York, 49 Misc 2d 10, 13, affd. 22 A D 2d 761.)
If we had found Crooked Creek to be a nonnavigable stream, we would have reached the same conclusion as to damages. A riparian owner may own the bed of the stream but he does not own the water which courses through the stream. He is only entitled to a reasonable use of such water as it passes his land. (See Strobel v. Kerr Salt Co., 164 N. Y. 303, 319; Fulton County Gas & Elec. Co. v. Rockwood Mfg. Co., 238 N. Y. 109, 115; Barkley v. Wilcox, 86 N. Y. 140, 146.) The State, as a riparian owner, except in the exercise of its police power, is subject to the same interpretation of rights and responsibilities as any other riparian owner. We cannot conceive of any legitimate use of the State’s police power, and claimant pointed to none, which would affect the flow of this stream in the future. To award damages predicated upon an unfortunate use of legal language would be to make a windfall award. This we will not do. (See Chili Plaza v. State of New York, 25 A D 2d 491, 492.)
Claimant’s principal stockholder testified that, after the construction of this bridge, one had to pole a motorboat under the bridge; and that such prevented effective water access to the upland creek frontage. However, the State appraiser stated that in August of 1968 he proceeded, in a 14 to 16 foot boat with an outboard motor together with three other men, under the bridge under power. Of course, if the bridge interfered with navigation on this stream, such interference would be damnum absque injuria. (See Marine Air Ways v. State of New York, 201 Misc. 349, 350, 351, affd. 280 App. Div. 1021; Miller v. Mayor of City of New York, 109 U. S. 385, 393; Colberg, Inc. v. State of California, 67 Cal. 2d 408, 415-418.)‘ We initially viewed subject property in December, 1968. However, the creek was frozen over and we could not make any visual determination of this point. Therefore, without objection from either counsel, we waited until late June, 1969 to view said property. At that time, with the co-operation of the State Police, we proceeded in a 16-foot Boston Whaler, with an 80 to 85 horsepower motor, down the St. Lawrence River into Chippewa Bay and up Crooked Creek. We had a 12-foot graduated engineering rod with us and, in the presence of claimant’s counsel and a State representative, the depth of water under the bridge was measured. We .found a channel 10 to 15 feet *81 wide with a depth of 8 to 11 feet. Even assuming much lower water, we doubt the necessity of poling a craft under this bridge. Furthermore, one will note the marsh indications at the mouth of the creek as it enters Chippewa Bay. The shallow quality of this bay was clearly observed when we viewed the property. If the creek water were to go down appreciably, we question whether the levels in Chippewa Bay would permit craft with a substantial draft to even reach the bridge in question.
The principal appropriation, Parcel 78 cut off a high land access area to a portion of the creek frontage. It was claimant’s appraiser’s opinion that a road would now have to be built over 800± feet of marshland to reach said area. He found an additional $1,700 cost because of this situation. This was not disputed at the trial; and, we so find.
We find that the fair and reasonable market value of subject property after the appropriation was $145,017. Claimant has been damaged in the sum of $9,008; of which $6,958 was direct damage and $2,050 was consequential damage.
We realize our after value is substantially higher than either appraiser’s after value. The reason for this is that we have not accepted the claimant’s theory of consequential damage. We believe our values and damages are within the component parts of the appraisal testimony presented. (Milsap v. State of New York, 32 A D 2d 1017 [3d Dept.].)