ATTORNEY GENERAL, *ex rel* DIRECTOR OF THE DEPARTMENT
OF NATURAL RESOURCES, v HALLDEN

1. NAVIGABLE WATERS—STRICTLY NAVIGABLE WATERS—FLOATABLE
   WATERS.
   Navigable waters in this state are divided into two classifications:
   strictly navigable and floatable; strictly navigable waters are
   those capable of use for valuable boat or vessel navigation;
   floatable waters are those suitable, in their natural condition,
   for the floating of logs or rafts of lumber.

2. NAVIGABLE WATERS—PUBLIC FISHING RIGHTS.
   Public fishing rights attach to a stream once it is established that
   the stream is found to be either strictly navigable or floatable.

3. NAVIGABLE WATERS—COMMERCIAL NAVIGATION—TEST—LOG FLOAT-
   ING TEST—RECREATIONAL USE.
   Commercial navigation and log floating tests of navigability are
   too narrow in scope to be relied upon for the purpose of
   determining the navigability of Michigan's waterways; recrea-
   tional uses alone will support a finding of navigability.

4. NAVIGABLE WATERS—LOG FLOATING TEST—PUBLIC RECREATIONAL
   USE.
   The navigability of a stream or river must be defined in terms of
   those public uses to which a waterway is most susceptible and
   not fixed by reference to activities, such as log floating, which
   no longer play a significant role in the utilization of Michigan's
   waterways; therefore Michigan's definition of "navigable wa-
   ters" must be expanded to include those waters which are
   suitable for public recreational use.

5. NAVIGABLE WATERS—PUBLIC USE—RIGHTS OF PUBLIC—RECREA-
   TIONAL USE.
   Members of the public have the right to navigate and to exercise
   the incidents of navigation in a lawful manner at any point

REFERENCES FOR POINTS IN HEADNOTES
[1] 56 Am Jur, Waters §§ 3, 178, 179, 184, 188.
[2] 56 Am Jur, Waters § 178.
[3–5] 56 Am Jur, Waters § 179 *et seq.*

below high water mark on waters of this state which are capable of being navigated by oar- or motor-propelled small craft; this is the recreational use test for navigable waters.

Appeal from Calhoun, Creighton R. Coleman, J. Submitted Division 3 November 8, 1973, at Grand Rapids. (Docket No. 14356.) Decided January 15, 1974.

Complaint by Frank J. Kelley, Attorney General, on the relation of Ralph A. MacMullan, Director of the Department of Natural Resources, against Eric Hallden and Zoja Hallden to enjoin defendants permanently from interfering with the passage of boaters and waders on the St. Joseph River. Judgment for plaintiff. Defendants appeal. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Jerome Maslowski,* Assistant Attorney General, for plaintiff.

*Cummins, Butler & Thorburn* (by *Charles A. Palmer),* for defendants.

Before: BASHARA, P. J., and McGREGOR and BRONSON, JJ.

McGREGOR, J. MCLA 307.41; MSA 13.1681 provides:

"That in any of the navigable or meandered waters of this state where fish have been or hereafter may be propagated, planted or spread at the expense of the people of this state or the United States, the people shall have the right to catch fish with hook and line during such seasons and in such waters as are not otherwise prohibited by the laws of this state."

For the purpose of enforcing public rights cre-

ated by the foregoing statute, plaintiffs instituted this action to permanently enjoin defendants frŏm interfering with the passage of boaters and waders on the St. Joseph River. From the trial court's judgment and order granting plaintiffs such relief, defendants appeal.

Defendants own property through which the St. Joseph River in Calhoun County flows. Because fishermen and boaters using the river were continually trespassing on their uplands, defendants placed chains across the river to prevent its use by the public. Plaintiffs brought this suit for the purpose of compelling defendants to remove these chains.

In support of their claim that defendants' riparian rights are subject to the above quoted statute, plaintiffs adduced evidence at trial to the effect that the river, in the area of defendants' property, had been used for hunting, fishing, boating and canoeing for at least 40 years, that the state planted fish in the river about seven miles downstream from the defendants' land from 1937 to 1943, and that these fish would have had no difficulty migrating upstream to the section of the river passing through defendants' land.

Additional evidence indicated that the average width of the river in the area is 79 feet and the average depth 22 inches. At the east boundary of defendants' land the river is 44 feet wide and roughly 28 inches deep. Approximately one-quarter of a mile downstream from defendants' west boundary, the river is 105 feet wide and about 20 inches deep. These measurements were made during spring high water and no evidence was introduced to show the low water mark.

The narrow issue before us is whether the trial court erred in ruling, on the basis of the foregoing

evidence, that the St. Joseph River is navigable as it flows through defendants' property.

Defendants contend that since no evidence was submitted at trial to show that the river section in question was ever used for commercial transportation or log floating, there is no factual support for the trial court's conclusion that the river is navigable at that point. Navigability not having been validly established, defendants submit that MCLA 307.41; MSA 13.1681 is inapplicable, and the trial court erred in granting injunctive relief on the basis of that statute.

Plaintiffs respond that recreational uses alone can support a finding of navigability.

Because of both the extent of Michigan's water resources and the central role played by the concept of navigability in the law of water rights, we approach the present issue with an abundance of Michigan precedent at our disposal. Unfortunately, this wealth of case law does as much to hinder as to facilitate our attempt to formulate a rational approach to the issue of navigability. This is so, not because past decisions lack in clarity or logic, but rather because century-old judicial pronouncements are basically a reflection of economic interests and values no longer of substantial importance in contemporary society. Prior definitions of navigability, linked inextricably to the commercial necessities of 19th century Michigan, are simply no longer meaningful tools in the judicial process of balancing the interests of both riparian owners and the public in Michigan's water resources. We must resist, therefore, the temptation to apply mechanically the rules expounded in an earlier and vastly different era, and must, instead, strive to mold the concept of navigability to the needs of the later 20th century. Indeed, it is sub-

mitted that the same judicial pragmatism which gave birth to those former definitions of navigability demands their abandonment now.

The importance of both commercial interests and judicial pragmatism is evident in the earliest and still most influential Michigan decision defining navigability: *Moore v Sanborne,* 2 Mich 520 (1853). One of the issues confronting the Court in that case was whether a portion of the Pine River was navigable. The evidence indicated that the portion of the river in question had been used only for floating logs and could be so used only during periodic freshets. Accordingly, the appellant first argued that the river was not navigable because it was incapable of commercial use by boat and hence not a public highway under English common law.[1] Rejecting this argument,[2] the Court

---

[1] Under English common law, watercourses subject to public use for navigation were apparently divided into two classes: (1) those in which the tide ebbed and flowed—termed navigable in law, and (2) those which, though unaffected by the tide, were of sufficient capacity for useful commercial navigation—termed navigable in fact, or public highways. The significance of this distinction laid primarily in the fact that the bed of a navigable stream was owned, as private and not public property, by the crown, whereas title to the bed of a stream termed a public highway was held by the riparian owner subject to an easement or servitude of navigation in favor of the public. *See generally Lorman v Benson,* 8 Mich 18 (1860), and Justice CAMPBELL'S dissent in *Sterling v Jackson,* 69 Mich 488, 506; 37 NW 845, 856 (1888).

However, for the view that the tidal test of navigability was never actually distinct from the public highway test, *see* 56 Am Jur, Waters, § 178, p 643, where it is asserted:

"But an examination of the English decisions and the works of the text writers of the time leads to the conclusion that the tidal test of navigability has never been the rule of the English courts, but that rather the question has been determined with respect to actual usability for navigation."

[2] The appellant's second argument was stated and rejected by the *Moore* court as follows:

"But it is urged that conceding such to be the rule [that capacity to float logs determines navigability], if a stream be not capable of being used to float mill logs, in an ordinary stage of water, it is not subject to the servitude of the public interests. But we have already attempted to show that a capacity for use to meet the public necessities

adopted the holding in *Brown v Chadbourne,* 31 Me 9, 21 (1849), as the Michigan test of navigability:

" 'The true test, therefore, to be applied in such cases is, whether a stream is inherently and in its nature, capable of being used for the purposes of commerce for the floating of vessels, boats, rafts, or logs. Where a stream possesses such a character, then the easement exists, leaving to the owners of the bed all other modes of use, not inconsistent with it.' " 2 Mich 520, 524–525.

Referring to the English rule requiring commercial transportation by boat, the Court noted:

"But this, we apprehend, is too narrow a rule upon which, in this country, to establish the rights of the public, and as already intimated, such is not the rule in any of the States. *The servitude of the public interest depends rather upon the purpose for which the public requires the use of its streams, than upon any particular mode of use*—and hence, in a region where the principal business is lumbering, or the pursuit of any particular branch of manufacturing or trade, *the public claim to a right of passage along its streams must depend upon their capacity for the use to which they can be made subservient.* In one instance, perhaps, boats can only be used profitably, from the nature of the product to be transported—whilst, in another they would be utterly useless. Upon many of our streams, although of sufficient capacity for navigation by boats, they are never seen—whilst rafts of lumber of immense value, and mill logs which are counted by thousands, are annually floated along them to market. Accordingly, we find that a capacity to float rafts and logs in those States where the manufacture of lumber is prosecuted as a branch of trade, is recognized as a criterion of the public right of passage and of use, *upon the*

furnishes the true test in such cases. *It is valuable, rather than continual use, which determines the public right."* (Emphasis added.) 2 Mich 520, 526.

A more extended discussion of this rule—that navigability is not dependent on continuity of use or capacity—can be found in *Thunder Bay Booming Co v Speechly,* 31 Mich 336 (1875).

*principle already adverted to, that such right is to be ascertained from the public necessity and occasion for such use."* 2 Mich 520, 525–526. (Emphasis added.)

Michigan's approach to the issue of navigability has progressed little in the 120 years since *Moore* was decided. Navigable waters in this state are divided into two classifications: strictly navigable and floatable (the latter sometimes termed navigable in a limited or qualified sense).[3] Strictly navigable waters are those capable of use for valuable boat or vessel navigation, *i.e.,* public highways under English common law. Floatable waters, as in *Moore,* are those suitable, in their natural condition, for the floating of logs or rafts of lumber. The distinction is most frequently employed in cases involving statutory interpretation, as in *In re Martiny Lakes Project,* 381 Mich 180; 160 NW2d 909 (1968), where the Court held that the term "navigable streams" in the inland lake level act of 1961, MCLA 281.61 *et seq.;* MSA 11.300(1) *et seq.,* referred to strictly navigable, and not floatable, streams. See also *Shepard v Gates,* 50 Mich 495; 15 NW 878 (1883).

For purposes of the present appeal, we need not dwell on the distinction between strictly navigable and floatable streams. Suffice it to say that once it is established that a stream is found to be included in either of the classifications, public fishing rights

[3] One of the earliest cases explicitly recognizing this distinction is *Grand Rapids v Powers,* 89 Mich 94, 111; 50 NW 661, 666 (1891), where the Court notes:

"There is a manifest difference between public streams that can be used successfully for the running of boats and vessels for the purpose of commerce and those which are only capable of being used for the floatage of lumber and logs in rafts or single pieces."

*See also* Justice T. E. Brennan's thoughtful and informative dissent in *Pigorsh v Fahner,* 386 Mich 508, 520; 194 NW2d 343, 348 (1972), and Bartke, *Navigability in Michigan in Retrospect and Prospect,* 16 Wayne L Rev 409 (1970).

attach. *Attorney General ex rel Director of Conservation v Taggart,* 306 Mich 432; 11 NW2d 193 (1943); *Collins v Gerhardt,* 237 Mich 38; 211 NW 115 (1926).[4] Writing to this point, a leading commentator has noted:[5]

"With the disappearance of the forests and the emergence of new technical means, logging no longer depends on floatable streams for its existence and the importance of such waters for floating purposes has disappeared. At the same time, the public has increasingly turned to such rivers for recreation, primarily trout fishing. In a series of cases, the court has held that such qualifiedly navigable waters, which at any point in time were used or usable for the floating of logs, are open to the public for fishing whether from boats or by means of wading, so long as they can be reached without trespass on the riparians' uplands. Therefore, the state may enjoin riparian owners from putting obstructions into the stream which prevent members of the public from proceeding in the river whether by boat or by wading."

In light of the above, the crucial aspect of this case is made clear. The plaintiffs failed to introduce any evidence at trial to establish that the section of the St. Joseph River in question had ever been used for valuable floatage or commercial transportation. Thus, under traditional definitions of navigability, there was no evidence from which the trial court could find the river to be navigable in either a limited or strict sense. Accordingly, the public's right to fish in the river had not been established. Yet, the trial court enjoined defendants from interfering with would-be fishermen on

---

[4] Cases from this and other jurisdictions dealing generally with public fishing rights are collected and discussed in Anno, 47 ALR2d 381, *Right of public to fish in stream notwithstanding objection by riparian owner* (1956).

[5] Bartke, *Navigability in Michigan in Retrospect and Prospect,* 16 Wayne L Rev 409, 440 (1970).

the basis that recreational uses alone can establish navigability. The question presently before us, then, is whether the traditional definition of navigability should be expanded to include recreational and not merely commercial uses of a waterway.

We approach this issue fully cognizant of both the limited role typically played by intermediate level appellate courts,[6] and the strictness with which the doctrine of stare decisis is applied in cases involving property rights.[7] Both these factors bid us hesitate before departing from the traditional tests employed by the courts of this state in deciding whether a waterway is navigable. Nonetheless, other considerations, discussed hereafter, compel us to agree with the trial court and hold that recreational uses alone can support a finding of navigability.

We submit that both the commercial navigation and log floating tests of navigability are too narrow in scope to be relied upon for the purpose of determining the navigability of Michigan's waterways. It must be recalled that the determination of the navigability *vel non* of a stream, river or lake establishes the respective rights of both riparian owners and the general public in the waterway. As the Supreme Court of Minnesota noted 80 years ago, in *Lamprey v State,* 52 Minn 181, 199; 53 NW 1139, 1143 (1893):

"The division of waters into navigable and nonnavigable is but a way of dividing them into public and private waters,—a classification which, in some form, every civilized nation has recognized; the line of divi-

---

[6] *See, e.g., Hosko v Hosko,* 20 Mich App 416, 421; 174 NW2d 317, 320 (1969), *rev'd* 385 Mich 39; 187 NW2d 236 (1971).

[7] *See, e.g., Lewis v Sheldon,* 103 Mich 102; 61 NW 269 (1894), and *Dolby v State Highway Commissioner,* 283 Mich 609; 278 NW 694 (1938).

sion being largely determined by its conditions and habits."

If a river in Michigan is found to be navigable, the riparian owner holds title to the river bed subject to a perpetual trust to secure to the public their rights of fishing and navigation. *Collins v Gerhardt, supra; Attorney General ex rel Director of Conservation v Taggart, supra.* In our view, such basic and important rights should not be fixed by reference to activities, such as log floating, which no longer play a significant role in the utilization of Michigan's waterways. Rather, the navigability of a stream or river should depend upon the uses to which such waterways are currently susceptible. *Moore v Sanborne, supra,* itself the fountainhead of the log-floating test in this jurisdiction, supports this view. We need only note that the Court's adoption of the log floating test in that case was a substantial expansion of the definition of navigability motivated by the Court's pragmatic recognition of the vital role played by Michigan's waterways in the development of this state's then embryonic lumber industry.[8] The log floating test was adopted, not because of any intrinsic merit, but rather because the streams and rivers of this state were chiefly utilized, at that time, for the transportation of forest products. The opinion makes clear

[8] "We have a large territory yet undeveloped, rich in forest and in mineral wealth—washed by vast bodies of water upon three sides, and threaded by innumerable streams which are capable of navigation, many of which are, and many others of which may be made serviceable in developing its resources—and with a commerce already established, rivaling in extent, that of some of the Atlantic States, and rapidly growing under the influence of increasing population, settlements, and wealth, it is of the first importance that the rights of the public be recognized, to the free use of all streams susceptible of any valuable floatage. In this commerce, our lumbering interests sustain, and will continue to sustain an important part, and their success depends to a vast, if not entire extent, upon this principle." *Moore v Sanborne, supra,* 524.

that navigability must be defined in terms of those public uses to which a waterway is most susceptible:

"The servitude of the public interest depends rather upon the purpose for which the public requires the use of its streams, than upon any particular mode of use * * * the public claim to a right of passage along its streams must depend upon their capacity for the use to which they can be made subservient." *Moore v Sanborne,* 2 Mich 520, 525–526 (1853).

Although *Moore* has been most frequently cited for the narrow log floating rule, these broader aspects of that opinion have been discussed on occasion. In *Attorney General ex rel Director of Conservation v Taggart, supra,* the Court upheld the public's right to fish in floatable streams. In so doing, the Court referred in passing to the basis of the *Moore* decision:

"While the *Sanborne* case only disposed of the right of floatage and did not decide that a floatable stream has the status of waters navigable for all purposes, *the public character of water was held to be determined by reference to the public necessity for its use.* It is this *broad underlying principle rather than the narrow rule of the Sanborne case which* was in effect adopted by the court in *Collins v Gerhardt, supra,* when it held that floatability determined the public character of a stream and affixed therein the public right of fishing." 306 Mich 432, 441–442. (Emphasis added.)

This "broad underlying principle" of *Moore*—that a watercourse's navigability is a function of its public usefulness and value—convinces us that the Michigan definition of "navigable waters" must be expanded to include those waters which are suitable for public recreational use.

With the gradual demise of this state's lumber

industry and the technological innovations of recent decades, the value of Michigan's forests is no longer measured in board feet and her rivers have ceased to serve as major arteries of commerce. The public looks to both our forests and rivers as recreational resources to be preserved and enjoyed and not as commercial windfalls to be exploited. To determine public boating and fishing rights in our waterways by reference to the log floating test of navigability is to ignore this fundamental change in the uses to which our water resources are primarily dedicated.[9] Stare decisis is a vital general principle of the common law, but not a requirement that precedent rendered meaningless by a century of change be followed without thought.[10] The strength of the common law tradition lies less in our willingness to repeat what has been said before than in our duty to insure that the law reflects the needs and values of the society it is designed to serve. Time and change have

[9] The words of Chief Justice THOMAS M. KAVANAGH, in a forceful and well-reasoned dissent advocating expansion of the concept of navigability, are appropriate here:

"The basic public purpose for which our lakes and streams are used in this day and age clearly are not commercial in the sense that commerce is strictly defined. Commercial travel by boats and canoes is obsolete and other modes of transportation are now in vogue for economic reasons of cost, time and facility of travel. Wholesale movement of logs via floating on lakes and streams is also obsolete and has been for so long that it is difficult to locate persons who have first-hand knowledge of whether logs were *ever* floated down a particular stream to the great lumber mills of the late 1800's.

"We must at this point examine the *ultimate* fact of navigability under the 'public purposes' test. That we may do so should be unquestioned." *In re Martiny Lakes Project,* 381 Mich 180, 212; 160 NW2d 909, 925 (1968). (Emphasis in original).

[10] "One day through the primeval wood
A calf walked home as good calves should;
But made a trail all bent askew,
A crooked trail, as all calves do.

\* \* \*

And men two centuries and a half
Trod in the footsteps of that calf.

\* \* \*

rendered the log floating test of navigability an anachronism and we today join the growing number of our sister states[11] in adopting the recreational use test.

A hundred thousand men were led
By one calf near three centuries dead.
They followed still his crooked way,
And lost one hundred years a day;
For thus such reverence is lent
To well-established precedent."

> Sam Walter Foss, *The Calf-Path*, taken from *Whiffs From Wild Meadows* (Boston, Lathrop, Lee, and Shepard Co., 1895).

[11] The following jurisdictions have adopted either the recreational use test or some substantially equivalent variant thereof:

*California: People v Mack,* 19 Cal App 3d 1040, 1050; 97 Cal Rptr 448, 454 (1971)

"The streams of California are a vital recreational resource of the state. The modern determinations of the California courts, as well as those of several of the states, as to the test of navigability can well be restated as follows: members of the public have the right to navigate and to exercise the incidents of navigation in a lawful manner at any point below high water mark on waters of this state which are capable of being navigated by oar or motor propelled small craft."

*Maryland: Toy v Atlantic Gulf & Pacific Co,* 176 Md 197; 4 A2d 757, 762 (1939)

"To the extent of its public use in the transportation by boat of person or property, the channel of Back Creek was a highway by water, although it was not actually adapted for passage by any but small craft, such as row boats and small launches, but to that extent it continued to serve a limited public purpose * * * "

*Minnesota: Lamprey v State,* 52 Minn 181, 199; 53 NW 1139, 1143–1144 (1893)

"But if, under present conditions of society, bodies of water are used for public uses other than mere commercial navigation, in its ordinary sense, we fail to see why they ought not to be held to be public waters, or navigable waters, if the old nomenclature is preferred. Certainly, we do not see why boating or sailing for pleasure should not be considered navigation, as well as boating for mere pecuniary profit.

\* \* \*

"If the term 'navigable' is not capable of a sufficiently extended meaning to preserve and protect the rights of the people to all beneficial public uses of these inland lakes, to which they are capable of being put, we are not prepared to say that it would not be justifiable, within the principles of the common law, to discard the old nomenclature, and adopt the classification of public waters and pri-

We therefore hold that members of the public
have the right to navigate and to exercise the

vate waters. But, however that may be, *we are satisfied that, so long
as these lakes are capable of use for boating, even for pleasure, they
are navigable, within the reason and spirit of the common-law rule.*"
(Emphasis added.)

*New York: Fairchild v Kraemer,* 11 AD2d 232, 235; 204 NYS2d 823,
826 (1960)

"Under the correct test of navigability, the paramount factor to be
considered is not the actual use to which a stream has been put, or
the purpose of its use that is important, but rather its capacity for
use and its susceptibility for use (in its original state or condition) for
trade, commerce, or travel. *The fact that a stream has been used for
pleasure boating may be considered on the subject of the stream's
capacity and the use of which it is susceptible."* (Emphasis added.)

*See also St. Lawrence Shores, Inc v New York,* 60 Misc 2d 74; 302
NYS2d 606 (1969).

*North Dakota: Roberts v Taylor,* 47 ND 146, 154; 181 NW 622, 626
(1921)

"A use public in its character, may exist when the waters may be
used for the convenience and enjoyment of the public, whether
traveling upon trade purposes or pleasure purposes. There is a
growing recognition that the utilities of nature, so far as public use
are concerned, are not always to be measured by the sign of the
dollar. Purposes of pleasure, public convenience, and enjoyment may
be public as well as purposes of trade. Navigation may as surely exist
in the former as in the latter."

*Ohio: Coleman v Schaeffer,* 163 Ohio St 202, 205; 126 NE2d 444, 446
(1955), where the Court quoted with approval from 56 Am Jur,
Waters, § 181, p 648, as follows:

" 'There is, however, much authority for the view, which has been
spoken of as being the better rule, that it is not necessary that the
water be capable of commerce of pecuniary value, and that boating or
sailing for pleasure should be considered navigation as well as boating
for mere pecuniary profit. And the expression is frequently used that
navigability for pleasure is as sacred in the eye of the law as
navigability for any other purpose. It has been held that the term
'navigable,' as used in a statute relating to the ownership of sub-
merged land, includes waters which are naturally available for use by
the public for boating, fishing, etc., although they may not be suscep-
tible of use for general commercial navigation.' "

*Ohio: Mentor Harbor Yachting Club v Mentor Lagoons, Inc,* 170 Ohio
St 193, 199–200; 163 NE2d 373, 378 (1959)

"As revealed in the *Coleman* case, *supra,* this court has extended
the criteria for determining navigability beyond the so-called 'com-
mercial usage' test * * * To decide navigability solely upon the basis
of such use fails to take cognizance of the tremendous increase in the
public use of waterways. The capacity of a watercourse for recrea-
tional boating is also a factor which may now be considered. The
Department of Natural Resources of this state estimates that over one

incidents of navigation in a lawful manner at any
point below high water mark on waters of this

million Ohio citizens make use of our waters. This department also
estimates that a total annual expenditure of approximately fifty
million dollars is being made in Ohio directly pursuant to such public
use. And this increased recreational use of our waters has been
accompanied by a corresponding lessening of their use for commerce.
We are in accord with the modern view that navigation for pleasure
and recreation is as important in the eyes of the law as navigation for
a commercial purpose."

*Oregon: Luscher v Reynolds,* 153 Or 625, 635–636; 56 P2d 1158, 1162
(1936)

" 'Commerce' has a broad and comprehensive meaning. It is not
limited to navigation for pecuniary profit. A boat used for the trans-
portation of pleasure seeking passengers is, in a legal sense, as much
engaged in commerce as is a vessel transporting a shipment of
lumber. There are hundreds of similar beautiful, small inland lakes
in this state well adapted for recreational purposes, but which will
never be used as highways of commerce in the ordinary acceptation of
such terms. As stated, in *Lamprey v State,* 52 Minn 181; 53 NW 1139,
1143; 18 LRA 670; 38 Am St Rep 541, quoted with approval in
*Guilliams v Beaver Lake Club, supra* [90 Or 13, 29; 175 P 437, 442
(1918)]: 'To hand over all these lakes to private ownership, under any
old or narrow test of navigability, would be a great wrong upon the
public for all time, the extent of which cannot, perhaps, be now even
anticipated.' Regardless of the ownership of the bed, the public has
the paramount right to the use of the waters of the lake for the
purpose of transportation and commerce."

*South Dakota: Hillebrand v Knapp,* 65 SD 414, 417; 274 NW 821, 822
(1937)

"In the early history of the common law the rights of the public in
navigable waters were confined to navigation. But the term 'naviga-
ble' has been extended and includes waters that are not navigable in
the ordinary sense. In *Flistrand v Madson,* 35 SD 457; 152 NW 796,
798, it was held, after a consideration of the statutory provisions
quoted and a review of many of the leading cases, that whether or not
waters are navigable depends upon the natural availability of waters
for public purposes taking into consideration the natural character
and surroundings of a lake or stream. * * * Thus in *Lamprey v State
(Metcalf),* 52 Minn 181; 53 NW 1139, 1143; 18 LRA 670; 38 Am St Rep
541, the Court said: 'Many, if not the most, of the meandered lakes of
this state, are not adapted to, and probably will never be used to any
great extent for, commercial navigation; but they are used—and as
population increases, the towns and cities are built up in their
vicinity, will be still more used—by the people for sailing, rowing,
fishing, fowling, bathing, skating, taking water for domestic, agricul-
tural, and even city purposes, cutting ice, and other public purposes
which cannot now be enumerated or even anticipated.' "

*Wisconsin: Muench v Public Service Commission,* 261 Wis 492, 505–
506; 53 NW2d 514, 519; *Reh,* 55 NW 40 (1952)

state which are capable of being navigated by oar or motor propelled small craft.[12]

Under this test, plaintiffs adduced sufficient evidence at trial to support the trial court's finding of navigability.

Affirmed. No costs, a public question being involved.

All concurred.

---

"In 1911 Wisconsin enacted the first Water Power Act, ch. 652, Laws of 1911, which contained a new definition of navigable streams and rivers which was very similar in wording to our present sec. 30.01(2), Stats., which reads:

" 'All rivers and streams which have been meandered and returned as navigable by the surveyors employed by the government of the United States, and all rivers, streams, sloughs, bayous and marsh outlets, whether meandered or nonmeandered *which are navigable in fact for any purpose whatsoever* are hereby declared navigable to the extent that no dam, bridge, or other obstruction shall be made in or over the same without the permission of the legislature.'

"Therefore, since 1911 it is no longer necessary in determining navigability of streams to establish a past history of floating of logs, or other use of commercial transportation, because any stream is *'navigable in fact'* which is capable of floating any boat, skiff, or canoe, of the shallowest draft used for recreational *purposes.*"

[12] This test is taken from the holding in *People v Mack, supra,* n 11.